John Siegal (JS 1036)
Richard J. Bernard (RB 6371)
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Appellant Metavante Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| METAVANTE CORPORATION,<br><br>               Appellant,<br><br>    v.<br><br>LEHMAN BROTHERS HOLDINGS INC.,<br>*et al.*,<br><br>             Appellees. | Case No. 09 CIV. 09839 (JSR) |

## APPELLANT METAVANTE CORPORATION'S BRIEF ON APPEAL

502679383

## <u>Table of Contents</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

BASIS OF APPELLATE JURISDICTION........................................................... 3

STATEMENT OF ISSUES PRESENTED ON APPEAL..................................... 3

APPLICABLE STANDARD OF APPELLATE REVIEW ................................... 3

STATEMENT OF THE CASE............................................................................... 4

ARGUMENT........................................................................................................ 8

POINT I: THE "SPIRIT" OF THE BANKRUPTCY CODE DOES NOT TIME LIMIT
METAVANTE'S ACTIONS ....................................................................... 8

    A.    The Legal Analysis Below Was Flawed ................................................ 9

    B.    The Statutory Safe Harbor Governs The Agreement Without Any
Deadline ................................................................................................ 11

    C.    The Legislative History Shows The Safe Harbor Has No Time Limitation........ 15

POINT II: THE CODE AND AGREEMENT PERMITTED METAVANTE TO SUSPEND
PAYMENTS AFTER DEFAULT ............................................................... 17

POINT III: THE BANKRUPTCY COURT ERRED ON PROCEDURE AND DEFAULT
INTEREST................................................................................................. 23

    A.    The Court Should Have Permitted Discovery And Held An Evidentiary
Hearing ................................................................................................. 23

    B.    The Court Should Have Denied Default Interest Or Required Evidence Of
The Proper Amount ............................................................................. 24

CONCLUSION....................................................................................................... 25

502679383

# TABLE OF AUTHORITIES

Page

**Cases**

*APWU v. Potter*
  343 F.3d 619, 626 (2d Cir. 2003)................................................................. 11

*Butner v. United States*
  440 U.S. 48, 53-57 (1979) ......................................................................... 19

*Continental Energy Assocs. L.P. v. Hazelton Management Fuel Co. (In re Continental Energy Assocs. L.P.)*
  178 B.R. 405, 408 (Bankr. M.D. Pa. 1995) ................................................. 22

*County of Nassau v. Leavitt*
  524 F.3d 408, 416 (2d Cir. 2008).............................................................. 11

*Enron Australia v. TXU Electricity*
  [2003] NSWSC 1169 ................................................................................. 17

*Ergonomic Sys. Philippines Inc. v. CCS Int'l Ltd.*
  7 A.D.3d 412, 413-14, 777 N.Y.S.2d 446, 447 (1st Dep't 2004)............................ 19

*H & C Development Group, Inc. v. Miner (In re Miner)*
  229 B.R. 561, 565 (2d Cir. BAP 1999)........................................................ 4

*In re Audre, Inc.*
  202 B.R. 490, 492 (Bankr. S.D. Cal. 1996),
  *aff'd.* 216 B.R. 19 (9th Cir. BAP 1997) ,
  *overruled on other grounds* by *Lopez v. Emerging Service Restoration, Inc. (In re Lopez)*
  367 B.R. 99, 104 n.2 (9th Cir. BAP 2007)................................................... 12

*In re Beker Indus. Corp.*
  64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986)..................................................... 23

*In re Dow Corning Corp.*
  215 B.R. 346, 355 (Bankr. E.D. Mich. 1997)................................................. 11

*In re Enron Corp.*
  2005 WL 3874285, No. 01-16034, *4 (Bankr. S.D.N.Y. Oct. 5, 2005) ...................... 9, 10, 11

*In re Enron Corp.*
  306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) .................................................. 10

*In re Keenan*
  201 B.R. 263, 264 (Bankr. S.D. Cal. 1996)................................................. 12

*In re Lehman Brothers Holdings Inc.*
  404 B.R. 752, 761 (Bankr. S.D.N.Y. 2009).................................................. 18

*In re Mirant Corp.*
  314 B.R. 347, 352 n.10 (Bankr. N.D. Tex. 2004)........................................... 12, 14

*In re Rhead*
  179 B.R. 169, 172 (Bankr. D. Ariz. 1995).................................................. 12

*In re Sapolin Paints, Inc.*
  20 B.R. 497, 499 (Bankr. E.D.N.Y. 1982).................................................... 20

*Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*
  574 F.3d 129, 144-45 (2d Cir. 2009)........................................................ 3, 24

*Liberty Mut. Ins. Co. v. Greenwich Ins. Co.*
  286 F. Supp.2d 73, 79 (D. Mass. 2003) ..................................................... 20

ii

*McLean Indus., Inc. v. Medical Lab. Automation, Inc. (In re McLean Indus. Inc.)*
  96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989) ................................................................ 21
*Morse/Diesel, Inc. v. Trinity Indus.*
  67 F.3d 435, 439 (2d Cir. 1995) .............................................................................. 4
*N.L.R.B. v. Bildisco and Bildisco*
  465 U.S. 513, 531 (1984) ........................................................................................ 21
*Orion Pictures Corp. v. Showtime Networks Inc. (In re Orion Pictures Corp.)*
  4 F.3d 1095, 1099-1102 (2d Cir. 1993) .................................................................. 23
*Pan Am Corp. v. Delta Air Lines, Inc. (In re Pan Am Corp.)*
  175 B.R. 438, 506 (S.D.N.Y. 1994) ........................................................................ 19
*R&O Elevator Co. v. Harmon*
  93 B.R. 667, 673 (D. Minn. 1988) .......................................................................... 21
*Summit Inv. & Dev. Corp. v. Leroux*
  69 F.3d 608, 610 (1st Cir. 1995) ............................................................................. 20
*Tablie v. Gonzales*
  471 F.3d 60, 64 (2d Cir. 2006) ............................................................................... 11
*U.S. v. Henning*
  344 U.S. 66, 75 (1952) ............................................................................................ 15
*U.S. v. Nielson*
  136 F.3d 265, 271 (2d Cir. 1998) ............................................................................ 4
*Wakefield v. Northern Telecom, Inc.*
  769 F.2d 109, 113 (2d Cir. 1985) , *modified on other grounds* 813 F.2d 535 (2d Cir. 1987).. 19

**Statutes**
11 U.S.C. § 362(b) .................................................................................................... 13
11 U.S.C. § 362(b)(12) ............................................................................................. 13
11 U.S.C. § 362(b)(13) ............................................................................................. 13
11 U.S.C. § 362(b)(20) ............................................................................................. 13
11 U.S.C. § 362(b)(3) ............................................................................................... 13
11 U.S.C. § 365 ........................................................................................................ 12
11 U.S.C. § 365(e)(1) ......................................................................................... passim
11 U.S.C. § 365(e)(2)(B) .......................................................................................... 12
11 U.S.C. § 502(b) .................................................................................................... 14
11 U.S.C. § 502(g)(2) ............................................................................................... 14
11 U.S.C. § 560 ................................................................................................... passim
11 U.S.C. § 561(a) .................................................................................................... 12
11 U.S.C. § 562 ........................................................................................................ 14
11 U.S.C. § 562(a) .................................................................................................... 14
28 U.S.C. § 1134(a) ................................................................................................... 3
28 U.S.C. § 158(a) ..................................................................................................... 3
Fed. R. Bankr. P. 7001 .............................................................................................. 24
Pub.L. 109-8, (j)(4) ................................................................................................... 14
Pub.L. 109-8, § 907 (j) (1) ........................................................................................ 14
Pub.L. 109-8, § 907(j)(2), (3) .................................................................................... 14

**Other Authorities**

Debtors' Objection To The Motion Of The California Public Employees' Retirement System For An Order Pursuant To 11 U.S.C. §§ 362 And 553 For Relief From The Automatic Stay To Effect A Non-Mutual Setoff, Docket No. 5920, at 2 (Nov. 24, 2009) ..................................... 18

Financial Accounting Standard No. 133, *Account for Derivative Instruments and Hedging Activities* ........................................................................................................................................... 6

**Treatises**

5 Collier On Bankruptcy ¶ 560.04[3] (2009) ........................................................................... 10

**Legislative MaterialsConstitutional Provisions**

*Bankruptcy Reform Report,* H. Rep. No. 109-31, Pt. 1, at 3-4 (2005) .......................................... 14

*Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing on H.R. 2057 and H.R. 1754 Before the Subcomm. on Economic and Commercial Law of the H. Comm. on the Judiciary,* 101st Cong. 16-17, 21 (1990) ................................................................... 12, 13, 16

H.R. No. 101-484 (19900 ....................................................................................................... 15

H.R. Rep. No. 109-31, Pt. 1, at 148-49 (2005) ........................................................................... 11

*Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Administrative Practices of the S. Comm. on the Judiciary,* 101st Cong. 1, 51 (1989) ............................................. 12, 16

S. Rep. No. 989, 95 Cong., 2d Sess. 59 (1978) ......................................................................... 20

**Articles8**

Andrew Ross Sorkin, *Lehman Files for Bankruptcy; Merrill Is Sold,* N.Y. TIMES, Sept. 15, 2008, *available at* http://www.nytimes.com/2008/09/15/business/15lehman.html?_r=1 .................... 1

Nick Ferguson, *Court says Lehman derivatives contracts are unenforceable,* FINANCEASIA.COM, Sept. 24, 2009, *available at* http://www.financeasia.com/print.aspx?CIID=156534 ............... 17

*Understanding the Metavante Decision,* LAW360, Oct. 14, 2009, *available at* http://bankruptcy.law360.com/print_article/128169 ................................................................. 17

502679383

## PRELIMINARY STATEMENT

Lehman Brothers' bankruptcy "reshape[d] the landscape of American finance" and threatened "a downward spiral in the markets stemming from a crisis of confidence."[1] It also left Appellant Metavante Corporation ("Metavante") without an effective counterparty in a swap agreement it had entered into to hedge its interest rate risk on a $1.75 billion loan.

When the Bankruptcy Court was asked to construe the rights and obligations of Lehman Brothers Special Financing Inc. ("LBSF" or the "Debtor") and Metavante resulting from their November 20, 2007 swap agreement (the "Agreement"), the Bankruptcy Court vitiated Metavante's statutory and contractual rights. It erroneously gave the Debtor complete control over the liquidation of the swap. And its *sui generis* decision overrode Congressional intent and spread the systemic risk caused by swap defaults by jeopardizing Metavante and other non-defaulting swap participants (and all those with which they do business) and the stability of the financial markets as a result of this and other financial industry bankruptcies.

The Bankruptcy Court erred in three fundamental ways.

*First*, the Bankruptcy Court wrongly limited Metavante's right under the Bankruptcy Code and the Agreement to determine the timing of whether and when it chooses to terminate or liquidate the Agreement following LBSF's bankruptcy default. Relying on what it described as the "spirit" of the Bankruptcy Code, the Bankruptcy Court erroneously held that Metavante had an undefined window of time to terminate the Agreement and that "its failure to do so, at this juncture, constitutes a waiver of that right at this point." RA, Ex. 10, p. 112. This legal determination is contrary to the plain language of the safe harbor provisions for swap agreements in Bankruptcy Code § 560, Congressional intent as evidenced in the legislative history, and the

---

[1] Andrew Ross Sorkin, *Lehman Files for Bankruptcy; Merrill Is Sold*, N.Y. TIMES, Sept. 15, 2008, *available at* http://www.nytimes.com/2008/09/15/business/15lehman.html?_r=1.

express terms of the Agreement, which is a standard industry form in use globally since the early 1990s. In so holding, the Bankruptcy Court stripped Metavante of all of its statutory and industry-standard protections in mitigating the impact of the Debtor's default. The Bankruptcy Court instead gave complete control over the timing and results of the settling-up of the swap to the Debtor – the party whose bankruptcy caused the problem in the first place. It must be reversed. (*See* Point I *below*.)

*Second,* despite the Debtor's default, the inability of Lehman Brothers Holdings, Inc. ("LBHI"), the Credit Support Provider under the Agreement, to provide the credit support for which Metavante bargained, and the Debtor's failure to affirm or reject the Agreement more than a year after the bankruptcy, the Bankruptcy Court nonetheless held that Metavante must continue to make quarterly payments under the Agreement. This ruling is contrary to the plain language of the Agreement that suspends Metavante's payment obligations when LBSF fails to meet the condition precedent of being default-free. It erroneously expands § 365(e)(1) of the Bankruptcy Code, which bans bankruptcy default provisions, to apply not just to bankruptcy defaults of parties, but also to bankruptcy events of non-parties, to a contract. And it deprives Metavante of its ability to protect its interests during the process of liquidating the Agreement by offsetting payments it owes against payments it will be owed by a debtor that is financially unable to pay. It, too, must be reversed. (*See* Point II *below*.)

*Third,* the Bankruptcy Court erred by ruling that no "non-bankruptcy" defaults existed under the Agreement despite refusing discovery or conducting a hearing on the issue and imposing default interest without a hearing. If and to the extent that this Court affirms the decision below, the case should be remanded for discovery and a hearing on whether other non-

bankruptcy defaults exist under the Agreement and whether any basis exists for the Bankruptcy

Court's award of default interest and, if so, how much. (*See* Point III *below*.)

For these reasons, as detailed below, Metavante asks that the Court reverse the decision

below. In the alternative, Metavante requests remand for factual determinations by the

Bankruptcy Court.

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§158(a) and 1134(a). The Bankruptcy

Court's order is a final, appealable order.

## STATEMENT OF ISSUES PRESENTED ON APPEAL

1.     Whether the Bankruptcy Court erred in holding that the "spirit" of the Bankruptcy

Code trumps the express wording of the Bankruptcy Code and the Agreement and requires the

imposition of a time limit on Metavante's right to exercise its contractual remedies.

2.     Whether the Bankruptcy Court erred as a matter of contract and bankruptcy law

by denying Metavante its right to suspend payments after the bankruptcy filing of LBHI, a non-

party to the Agreement.

3.     Whether the Bankruptcy Court erred by denying Metavante the right to take

discovery and present its evidence at a hearing on the issues of waiver, non-bankruptcy defaults

under the Agreement, damages and default interest.

## APPLICABLE STANDARD OF APPELLATE REVIEW

A bankruptcy court's conclusions of law are subject to *de novo* review by the District

Court on appeal. *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 144-45 (2d

Cir. 2009). In rendering the decision below, Bankruptcy Judge Peck noted he was making a

determination under the Bankruptcy Code (the "Code") and the terms of the parties' Agreement.

RA, Ex. 10, p. 109. Statutory construction and interpretation of a contract are matters of law for

the court to determine. *U.S. v. Nielson*, 136 F.3d 265, 271 (2d Cir. 1998) (statutory

construction); *Morse/Diesel, Inc. v. Trinity Indus.*, 67 F.3d 435, 439 (2d Cir. 1995) (contract

interpretation). Accordingly, this appeal is subject to *de novo* review by this Court, which

requires this Court to review questions of law independently of the Bankruptcy Court's

determination. *H & C Development Group, Inc. v. Miner (In re Miner)*, 229 B.R. 561, 565 (2d

Cir. BAP 1999).

## STATEMENT OF THE CASE

### Nature Of The Case

On September 15, 2008, LBHI filed the largest bankruptcy case in history. Three weeks

later, on October 3, 2008, LBSF filed its own bankruptcy petition.

This contested matter was brought by LBSF to force Metavante to make payments under

the Agreement that had been suspended due to the events of default arising from the LBHI and

LBSF bankruptcy filings.

The Bankruptcy Court was asked to construe the Code and the Agreement to determine

whether and when Metavante could terminate or liquidate and offset under the Agreement,

whether it had properly suspended payments under the Agreement due to the bankruptcies, and

other related issues.

### The Decision Below

The Decision Below was rendered orally on September 15, 2009 (the "Decision Below"),

and reduced to an Order entered September 17, 2009. The Order mandated Metavante to

"perform its obligations to make payments to LBSF under the Agreement, without regard to any

alleged defaults by LBSF." RA, Ex. 9, p. 2. In the Order, the court below specifically directed

Metavante to make three prior quarterly payments, including paying default interest, and "all

other payments to LBSF under the Agreement," while reserving to LBSF the continuing right to assume or reject the Agreement without any time restriction. *Id.*

The court below reached this result through three main holdings in the Decision Below, each challenged on appeal here.

First, Judge Peck admitted during oral argument on July 14, 2009 that there is no "express time limit built into [section] 560" (RA, Ex. 8, p. 31) on Metavante's right to terminate the Agreement and, consequently, the Agreement did not violate the general policy against enforcement of bankruptcy default clauses, also known as *ipso facto* clauses. 11 U.S.C. § 365(e)(1). "Nor," he acknowledged, "is there any express time limit set forth in any of the legislative history. ..." *Id.* Rather, the Bankruptcy Court imposed a timing restriction for exercising rights pursuant to the § 560 safe harbor provisions, holding that "Metavante's window to act promptly under the safe harbor provisions has passed...." RA, Ex. 10, p. 111. The Bankruptcy Court held that Metavante waived its rights under the safe harbor provisions of the Code because it did not exercise them promptly. This added a statutorily non-existent time requirement to the safe harbor provisions that counterparties to swap agreements must exercise their rights "fairly contemporaneously" or risk forfeiture. *Id.*

Second, the Bankruptcy Court held that LBSF and LBHI "are entitled to continued receipt of payments under the Agreement" (RA, Ex. 10, pp. 112-113) and that Metavante's failure to make payments constituted an attempt to control estate property and a violation of the automatic stay. *Id.*

Third, the Bankruptcy Court denied Metavante's request to take discovery or hold an evidentiary hearing regarding defaults under the Specified Indebtedness provision of the

Agreement, or any other potential defaults, and it ordered the payment of default interest by Metavante.

## Statement Of Facts

### The Parties

Metavante provides banking and payments technologies to financial services firms and businesses worldwide. RA, Ex. 2, p. 1.

Prior to bankruptcy, LBHI and certain of its affiliates were the fourth largest investment bank in the U.S. RA, Ex. 1, p. 6. LBHI provided, *inter alia*, credit support in connection with swap agreements entered into between LBSF and various counterparties. LBHI is the indirect parent of LBSF. Prior to the LBSF bankruptcy, LBSF, a separate corporate entity from LBHI, dealt in hedging products, including interest rate swaps. RA, Ex. 2, pp. 2-3.

### The Swap Agreement

Metavante entered into a term loan in the aggregate principal amount of $1.75 billion, bearing interest at a floating rate based on the 3 month LIBOR plus 1.75%. RA, Ex. 2, p. 2. Metavante utilized interest rate swaps to mitigate interest rate risk. *Id.* Metavante intended the swaps to qualify as cash flow hedges in accordance with generally accepted accounting principles.[2] It did not enter into swaps for speculative purposes. *Id.*

To hedge its interest rate risk, on November 20, 2007, Metavante entered into the Agreement with LBSF, then to a trade confirmation dated December 4, 2007. *Id.* Metavante entered into the Agreement with LBSF primarily because LBSF held itself out as having the ability to meet the institutional needs and requirements for the transaction, because it offered LBHI as the Credit Support Provider.

The relevant terms of the Agreement are as follows:

---

[2] Financial Accounting Standard No. 133, *Account for Derivative Instruments and Hedging Activities*.

- The initial notional value of the Agreement is $600,000,000. RA, Ex. 3, p. 40.

- The absence of a bankruptcy filing by LBHI and LBSF is an express condition precedent to any payment obligation of Metavante. RA, Ex. 3, pp. 7 and 11-12.

- The bankruptcy of a party or any Credit Support Provider is an event of default and a termination event. RA, Ex. 3, pp. 11-14.

- Metavante agreed to pay a fixed rate of interest to LBSF in exchange for payment of a variable rate of interest to be paid by LBSF based upon the three month LIBOR rate. RA, Ex. 3, p. 40.

- The expiration date of the Agreement is February 1, 2012. RA, Ex. 3, p. 40.

Contemporaneously with the Agreement, LBHI entered a guarantee (the "Guaranty") as a credit

support document, pursuant to which LBHI guarantees payment under the Agreement. RA,

Ex. 3, p. 36.

### Defaults And The LBHI And LBSF Bankruptcy Filings

Less than ten months after Metavante and LBSF entered into the Agreement, LBHI

commenced its chapter 11 case. RA, Ex. 2, p. 3. Under the Agreement, *LBHI's* voluntary filing

was an Event of Default giving Metavante two distinct, important and non-exclusive rights:

(i) the right to terminate the Agreement with *LBSF* (which, then, was not in bankruptcy), and

(ii) the right to suspend payments. RA, Ex. 3, pp. 3, 7, 14.

LBHI's bankruptcy filing left Metavante without an effective counterparty in LBSF,

which Metavante reported in its publicly filed financial statements for the period ending

September 30, 2008. RA, Ex. 2, p. 3. Metavante concluded that the Agreement could not be

treated as a hedge for accounting purposes because it was no longer probable that LBSF could

make contractually required cash payments in the event that the 3 month LIBOR exceeded the

fixed rate of interest set forth in the Agreement. RA, Ex. 3, p. 4.

On October 3, 2008, LBSF commenced its chapter 11 case. RA, Ex. 2, p. 3. The

subsequent filing by LBSF was an additional and independent Event of Default under the

Agreement giving Metavante the right, but not the obligation, to terminate the Agreement, and to suspend payments. *Id.*

Subsequent to the chapter 11 filings, Metavante unsuccessfully attempted to communicate with LBSF and LBHI regarding the Agreement. Metavante ultimately concluded that it had no alternative except to protect itself by entering into a replacement hedge for a potential rise in interest rates for the period from November 3, 2008 through February 1, 2010, at a cost in excess of $9 million. RA, Ex. 2, pp. 4 and 14.

On October 5, 2009, LBSF served a demand letter on Metavante, demanding immediate payment of $11,085,554.68, plus default interest in the amount of $662,915.72, for a total of $11,748,470.40. RA, Ex. 12, p. 6.

## ARGUMENT
## POINT I

### THE "SPIRIT" OF THE BANKRUPTCY CODE DOES NOT TIME LIMIT METAVANTE'S ACTIONS

The Bankruptcy Court erred as a matter of law by holding that Metavante's "conduct of riding the market for the period of one year, while taking no action whatsoever, is simply unacceptable and contrary to the spirit of these provisions of the Bankruptcy Code." RA, Ex. 10, p. 110. Its conclusion that "Metavante's window to act promptly under the safe harbor provisions has passed, and . . . constitutes a waiver of that right at this point" (RA, Ex. 10, pp. 110-111) is simply wrong as a matter of law. As shown below, the Bankruptcy Court's legal analysis is unsupported (Point IA); the express terms of the Agreement impose no time limits (Point IB); the statutory language places the Agreement in a safe harbor and imposes no time limits (Point IC); and the legislative history and Congress' purpose and intent of stabilizing the credit markets and preventing the spread of defaults demonstrate Congressional intent not to impose time limits on the safe harbor (Point ID).

A.    <u>**The Legal Analysis Below Was Flawed**</u>

The plain language of § 560 states:

> The exercise of any contractual right of any swap participant or financial
> participant to cause the liquidation, termination, or acceleration of one or more
> swap agreements because of a condition of the kind specified in section 365(e)(1)
> of this title [*i.e.*, bankruptcy] or to offset or net out any termination values or
> payment amounts arising under or in connection with the termination, liquidation,
> or acceleration of one or more swap agreements shall not be stayed, avoided, or
> otherwise limited by operation of any provision of this title or by order of a court
> or administrative agency in any proceeding under this title.

At oral argument below, Judge Peck candidly acknowledged that the language of this safe

harbor and its legislative history do not expressly impose any time limit on Metavante's right to

terminate or liquidate the swap Agreement:

> [I]t doesn't say it's impermissible to do what Metavante has done.  Nor is there
> any express time limit built into 560.  Nor is there any express time limit set forth
> in any of the legislative history.

RA, Ex. 8, p. 31.

Due to this judicial admission that no statutory or Congressional support exists for the

holding below, the Bankruptcy Court had to look elsewhere.  In the Decision Below, it identified

only two sources to support its holding that the "spirit" of the Code imposes a time limit on

termination or liquidation of swap agreements by non-defaulting counterparties.

First, the court below engaged in a truncated and highly-selective one paragraph

legislative history analysis that totally distorts the extensive two decade Congressional record on

this point.  We show below at Point IC that Congress had the opportunity to explicitly require

swap parties to terminate pursuant to deadlines, but that Congress chose not to do so.

Second, the court below cites *In re Enron Corp.*, 2005 WL 3874285, No. 01-16034, *4

(Bankr. S.D.N.Y. Oct. 5, 2005) (the "2005 Enron Decision"), for the proposition that "a

counterparty's action under the safe harbor provisions must be made fairly contemporaneously

with the bankruptcy filing...." While the 2005 Enron Decision court "discovered" a non-existent "contemporaneous" requirement in the § 560 safe harbor provision, careful reading of that decision demonstrates that absolutely no basis exists for such a requirement.

The only authority cited in the 2005 Enron Decision to support that "the election to terminate must be made fairly contemporaneously with the bankruptcy filing" was a decision the year before in the same case. *Id.* (citing *In re Enron Corp.*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) (the "2004 Enron Decision").

The 2004 Enron Decision, however, is completely silent as to any concept of a time limitation on the right of a swap participant to liquidate or terminate. Instead, the passage of the 2004 Enron Decision cited in the 2005 Enron Decision merely states the obvious statutory point that "Section 560 simply permits the exercise of termination rights by a non-defaulting swap participant so long as the enforcement of those rights is first triggered because of a condition of the kind specified in section 365(e)(1)," *id.*, namely, that the triggering default was a bankruptcy filing. The 2004 Enron Decision court made it very clear that the sole limitation on the safe harbor it was addressing was that the right to exercise a termination right protected by the safe harbor only applies to bankruptcy defaults.[3] The 2005 Enron Decision court somehow transmogrified this basic statutory limitation on the *type* of default that falls in the safe harbor into a limitation on the *time* within which a swap participant can exercise a termination or liquidation right within the safe harbor. There was simply no basis in logic or law for this "contemporaneous" requirement which the Bankruptcy Court created. This Court should,

---

[3] The authority cited in the 2004 Enron Decision on this point could not make the point any more clearly. *See* 5 Collier On Bankruptcy ¶ 560.04[3] (2009)) ("It should be noted that section 560 does not protect the exercise of swap agreement . . . termination . . . rights for all kinds of defaults. Rather, it protects only rights triggered by 'a condition of the kind specified in section 365(e)(1)' (*i.e.*, so-called *ipso facto* clauses or bankruptcy defaults)"). *Id.*

therefore, reject the 2005 Enron Decision, reject the "contemporaneous" requirement, and enforce the plain language of § 560 which provides Metavante with the unlimited right within the safe harbor to liquidate or terminate the Agreement.

**B.     The Statutory Safe Harbor Governs The Agreement Without Any Deadline**

Whether and when to liquidate or terminate a swap agreement if the counterparty is in bankruptcy is an essential protected right of a non-defaulting party. The market circumstances of non-defaulting swap participants can fluctuate dramatically. Section 560 protects and preserves from any judicial limitation Metavante's contractual rights to minimize the loss resulting from LBSF's defaults under the Agreement. Thus, the Bankruptcy Court's erroneous decision, which compelled Metavante to make interim payments to LBSF on threat of sanctions, impermissibly deprived Metavante of the contractual rights to liquidate, terminate, accelerate, net and setoff expressly protected by § 560 and the other safe harbor provisions of the Code.

Prior to 2005, the caption and text of § 560 only included the word "terminate" and "termination." In 2005, Congress expanded the statute by striking from caption and text the phrase "[c]ontractual right to terminate a swap agreement" and replacing it with the phrase "[c]ontractual right to liquidate, terminate, or accelerate a swap agreement," thereby clarifying and expanding the safe harbor protections. H.R. Rep. No. 109-31, Pt. 1, at 148-49 (2005) ("Bankruptcy Reform Report").[4] Although the Code does not define "liquidation," courts have held it to mean the process of determining, ascertaining, computing or settling the amount of a debt or claim. *See, e.g., In re Dow Corning Corp.,* 215 B.R. 346, 355 (Bankr. E.D. Mich. 1997) ("a claim is liquidated when it is capable of ready determination [or computation]) (quoting *In re*

---

[4] Courts must, where possible, give effect to every word of a statute. *County of Nassau v. Leavitt,* 524 F.3d 408, 416 (2d Cir. 2008) (citing *Tablie v. Gonzales,* 471 F.3d 60, 64 (2d Cir. 2006)). Also, courts decline to read statutes in such a way as to render some of its terms superfluous. *APWU v. Potter,* 343 F.3d 619, 626 (2d Cir. 2003)

*Standard Insulations, Inc.*, 138 B.R. 947, 953 (Bankr. W.D. Mo. 1992), *abrogated by Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 389 (1993)); *In re Audre, Inc.*, 202 B.R. 490, 492 (Bankr. S.D. Cal. 1996), *aff'd.* 216 B.R. 19 (9th Cir. BAP 1997), *overruled on other grounds* by *Lopez v. Emerging Service Restoration, Inc. (In re Lopez)*, 367 B.R. 99, 104 n.2 (9th Cir. BAP 2007); *In re Keenan*, 201 B.R. 263, 264 (Bankr. S.D. Cal. 1996); *In re Rhead*, 179 B.R. 169, 172 (Bankr. D. Ariz. 1995).  By executing a replacement hedge, suspending payment under the Agreement, and initiating the determination of netting and offset amounts that were and might in the future become owing under the Agreement, Metavante was clearly exercising its protected contractual right to "liquidate" the Agreement under § 560.

The rights of Metavante as the non-defaulting party, which include the rights to suspend payments, liquidate, terminate or accelerate and offset, cannot be limited or affected by LBSF's bankruptcy.[5]  The safe harbors not only protect Metavante's contractual rights, but prohibit any court order from limiting these rights. *See* 11 U.S.C. §§ 560, 561(a); *In re Mirant Corp.*, 314 B.R. 347, 352 n.10 (Bankr. N.D. Tex. 2004) ("Congress, in enacting section 560 and related provisions, did not intend that its will would be frustrated by the courts creating barriers to the exercise by a debtor's contract parties of the rights so given them").[6]

---

[5] LBSF retains its right to reject the Agreement under § 365, which is not at issue here.

[6] The Agreement also falls in the broader safe harbor § 365(e)(2)(B) of the Code because it is "a contract to make a loan, or extend … financial considerations, to or for the benefit of the debtor …" This is an additional statutory reason why the *ipso facto* limitations under § 365(e)(1) do not apply to the Agreement. The legislative history makes it clear that the creation of the safe harbor for swaps under § 560 did not necessarily imply that they might not also qualify for the safe harbor under § 365(e)(2)(B). *See, e.g., Interest Swap: Hearing on S. 396 Before the Subcomm. on Courts and Administrative Practices of the S. Comm. on the Judiciary*, 101st Cong. 1, 51 (1989) ("Senate Swap Hearing"); *Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing on H.R. 2057 and H.R. 1754 Before the Subcomm. on Economic and Commercial Law of the H. Comm. on the Judiciary*, 101st Cong. 16-17, 21 (1990) ("House Swap Hearing").

Congress did not express any time limitation in § 560.  The Bankruptcy Court's decision to impose this restriction violates and rewrites the express statutory language.

Upon default, the safe harbor protects Metavante's rights to liquidate, terminate or accelerate and to net and offset any liabilities which Metavante might have upon an eventual termination of the swap transactions against any liabilities of LBSF and LBHI under the Agreement.  Section 2(a)(iii) of the Agreement, which is the standard industry-wide ISDA master agreement version, does not provide a time limit for Metavante's exercise of its rights to suspend payments to LBSF, because it expressly contemplates that the netting or setoff process, which is so critical to the swap hedging relationship, occurs either at the time the non-defaulting party elects to terminate the swap agreement or at the conclusion of the swap agreement.

Congress knows how to impose time limitations in statutes and has done so with a number of the automatic stay exceptions under § 362(b).  *See, e.g.,* 11 U.S.C. § 362(b)(3), (b)(12), (b)(13), (b)(20) (all imposing certain temporal limitations).  Section 362(b)(20) was added to the Code in 2005, when Congress revised and expanded the safe harbor protections. Yet, the safe harbor provisions contain *no* time limitations whatever, and Congress clearly was aware that it was not imposing any time constraint when it considered the bill that was originally enacted as § 560.[7]  If Congress intended to impose a deadline on a non-debtor's right to liquidate, terminate, or accelerate or to offset or net out termination or close-out values arising under, a swap agreement, Congress would have specified such a deadline in the plain language of § 560.

---

[7] See *House Swap Hearing, supra* note 6, at 64-65 (colloquy between Subcomm. Chairman Jack Brooks and William J. Perlstein, Partner, Wilmer, Cutler & Pickering).

Congress certainly had the opportunity to include a time limitation if it considered the absence of one to be a problem, for the latest round of detailed amendments to § 560 occurred in 2005.[8]

In enacting § 560 (and the other safe harbor provisions), Congress sought to preserve the full termination rights of a party under a swap agreement as those rights would have existed under the terms of the agreement outside of bankruptcy. *See, e.g., Mirant Corp.*, 314 B.R. at 352 n.10 (rejecting claim that swap participant waived right to terminate swap because of failure to comply with court's order in timely way).

In further support against the imposition of a time limitation, Congress enacted § 562 as part of the safe harbor scheme. Section 562(a), which applies to swap agreements, deals specifically with the timing of damage measurement, as follows:

> If the trustee rejects a swap agreement . . . or if a . . . swap participant liquidates, terminates, or accelerates such contract or agreement, damages shall be measured as of the earlier of –
>
> (1) the date of such rejection; or
>
> (2) the date or dates of such liquidation, termination, or acceleration.

Clearly, § 562(a) permits the potential rejection by the trustee (or debtor in possession) or liquidation, termination or acceleration by the non-debtor party at any time postpetition. This is similar to the statutory scheme dealing with executory contracts. Unlike executory contracts, however, damage claims against the estate for swap agreements and other derivatives are measured "as of the earlier of (1) the date of [the trustee's] rejection; or (2) the date or dates of [the non-debtor counterparty's] liquidation, termination, or acceleration," and not "as of the date of the filing of the petition." *Compare* 11 U.S.C. § 562(a) with § 502(b). The claim against the estate is treated as a prepetition claim, *see* 11 U.S.C. § 502(g)(2), even though the amount is

---

[8] 2005 Amendments. Pub.L. 109-8, § 907 (j) (1), Pub.L. 109-8, § 907(j)(2), (3) and Pub.L. 109-8, (j)(4); *see also Bankruptcy Reform Report,* H. Rep. No. 109-31, Pt. 1, at 3-4 (2005).

measured as of postpetition dates determined by either party's actions.  This statutory scheme

would make no sense if the non-debtor counterparty had a deadline to terminate.  *See Ames*

*Dep't Stores*, 582 F.3d at 430 (refusing to read terms into statute when proposed additional terms

ignore fact that proposed terms directly conflict with statute's plain language).

For these reasons, any time limitation contravenes the safe harbor statutory scheme.

When Congress enacted and later expanded § 560, it "said what it meant and meant what it said."

*U.S. v. Henning,* 344 U.S. 66, 75 (1952).

**C.     The Legislative History Shows The Safe Harbor Has No Time Limitation**

The Bankruptcy Court held that "Congress intended" the safe harbor provisions to be

exercised contemporaneously with the bankruptcy filing, citing only two vague phrases in a

Senate report.  In fact, however, the legislative history shows that Congress intended no time

limits in the safe harbor protections.

Congress' primary concern was to ensure that bankrupt parties – not their non-defaulting

counterparties – do not use the automatic stay and other powers conferred under the Code to

"game the market" by unfairly locking innocent swap participants in agreements: "The setoff

process, which is the center of the swap agreement, may be skewed if one of the parties has filed

for bankruptcy."  H.R. No. 101-484 (1990), at 3 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223,

225.  The House explained the purpose of the swap safe harbor as follows:

> The purpose . . . is to ensure that the swap and forward contract financial markets
> are not destabilized by uncertainties regarding the treatment of their financial
> instruments under the Bankruptcy Code.  The bill provides the same exemption
> from the Bankruptcy Code's automatic stay and trustee avoidance provisions to
> interest rate and foreign currency rate swap agreements that current law provides
> to other similar types of financial agreements, including repurchase agreements,
> securities contracts, commodities contracts, and forward contracts.

H.R. Rep. No. 101-484, at 1 (1990).  Again, there is no time limit and no mention of any need

for immediate or contemporaneous termination.  Congress was aware that it could require non-

defaulting counterparties to terminate their swap agreements with a debtor upon bankruptcy, but decided *not* to mandate immediate termination or setoff.[9]

Public policy clearly does not support the imposition of a time constraint on the ability of the non-defaulting participant to exercise safe harbor protections. The Bankruptcy Court expressed a concern that allowing Metavante to exercise its termination rights any time postpetition would allow Metavante to play the market. But the very terms of the ISDA master agreement used by these parties, the non-defaulting party *always* has the right after the other party's or its guarantor's bankruptcy to choose when to liquidate and net out swap agreements and the right to suspend its payment and performance during that time. These rights exist as a result of *any default*, not just as a result of the counterparty's bankruptcy filing, and they serve an important purpose. To impose a time limit within which a swap hedge must be liquidated or terminated prevents the non-defaulting party from managing and minimizing its risk of loss, while incurring the additional, indeed duplicative, economic cost of rehedging. To impose such a burden on the non-defaulting party can only defeat Congress's goal of protecting the financial markets and economic welfare of innocent swap participants from the potentially catastrophic risk caused by the bankruptcy of debtors like LBSF and LBHI.

The equities also favor protection of a non-defaulting counterparty's right to suspend and liquidate, for the non-defaulting party did not breach the agreement and the debtor party did. These rights provide the non-defaulting party with a means of protecting its interests under the agreement by ensuring cash at hand if the market turns, as well as deferring payment obligations

---

[9] *See, e.g. Senate Swap Hearing, supra*, n.6 at 132; *House Swap Hearing, supra*, n.6, at 62-63, 64-65.

to permit the non-defaulting party to secure a replacement hedge – exactly what Metavante did here.[10]

In the event of a default (including a default triggered by the financial instability of the Credit Support Provider) where there is no bankruptcy, the non-defaulting party cannot be forced to terminate the agreement immediately and, if then out of the money, lock in a loss. Rather, the non-defaulting party has the option to terminate or liquidate at any time throughout the duration of the agreement and to suspend performance until termination or expiration, when the parties will close-out and offset obligations. By authorizing the suspension of performance, the Agreement recognizes the need to preserve the non-defaulting party's ability to rehedge, minimize loss and protect its economic interest under the Agreement. To promote market stability, the Code's safe harbor provisions prohibit any limitation of these standard market rights.

For all of these reasons, the Decision Below must be reversed.

## POINT II

### THE CODE AND AGREEMENT PERMITTED METAVANTE TO SUSPEND PAYMENTS AFTER DEFAULT

The Bankruptcy Court erred, as a matter of law, in holding that Metavante was not entitled to suspend its payments due to the bankruptcy filing of LBHI, Metavante's Credit

---

[10] The Bankruptcy Court's decision to compel Metavante's performance under the Agreement contrasts with the 2004 decision of the Australian Supreme Court in *Enron Australia v. TXU Electricity*, [2003] NSWSC 1169, which upheld a counterparty's right to withhold payment pursuant to Section 2(a)(iii) of the ISDA Master Agreement. The Decision Below clouds trading by market participants in the U.S. and around the world. *Understanding the Metavante Decision*, LAW360, Oct. 14, 2009, *available at* http://bankruptcy.law360.com/print_article/128169. RA, Ex. 15. The disparity destabilizes the U.S. derivatives market. Counterparties can avoid the consequences of the Bankruptcy Court's decision by trading with dealers outside of the U.S. or with dealers that are not subject to U.S. bankruptcy proceedings. Nick Ferguson, *Court says Lehman derivatives contracts are unenforceable*, FINANCEASIA.COM, Sept. 24, 2009, *available at* http://www.financeasia.com/print.aspx?CIID=156534. RA, Ex. 15.

Support Provider under the Agreement.  In the Decision Below, the Bankruptcy Court

completely ignored the distinction between LBSF and LBHI and incorrectly treated their

respective bankruptcy filings as the same event for purposes of determining Metavante's rights

under the Agreement and the Code.  *See, e.g.*, RA, Ex. 10, p. 108.[11]

The Agreement is crystal clear that the bankruptcy filing of LBHI, the Credit Support

Provider, is an independent Event of Default.  Section 5(a) of the Agreement provides:

> The occurrence at any time with respect to a party [to the Agreement], or, if
> applicable, any Credit Support Provider of such party . . . of any of the following
> events constitutes . . . an event of default (an "Event of Default") with respect to
> such party:
>
> (vii) <u>Bankruptcy</u>.  The party, [or] any Credit Support Provider of such
> party . . . institutes . . . a proceeding seeking a judgment of insolvency or
> bankruptcy or any other relief under any bankruptcy or insolvency law or other
> similar law affecting creditors' rights.

RA, Ex. 3, pp. 11 and 12.

This Event of Default suspended Metavante's payment obligations under the Agreement.

Section 2 of the Agreement provides the obligation that "[e]ach party will make each payment . .

. to be made by it," subject to "the condition precedent that no Event of Default . . . with respect

to the other party has occurred and is continuing."  RA, Ex. 3, p. 7.  As a result of the separate

bankruptcy filing of LBHI, Metavante was entitled to invoke the "condition precedent" provision

of Section 2(a)(iii) of the Agreement and to suspend payments to LBSF.

---

[11] The blurring of this distinction contravenes the concerns regarding the separate identities of the
Lehman-related entities recognized by the Bankruptcy Court in *In re Lehman Brothers Holdings
Inc.*, 404 B.R. 752, 761 (Bankr. S.D.N.Y. 2009), namely, and is belied by Lehman Brothers'
position recently taken before the Bankruptcy Court – that LBHI and LBSF are separate and
distinct entities. *See* Debtors' Objection To The Motion Of The California Public Employees'
Retirement System For An Order Pursuant To 11 U.S.C. §§ 362 And 553 For Relief From The
Automatic Stay To Effect A Non-Mutual Setoff, Docket No. 5920, at 2 (Nov. 24, 2009).

Under New York contract law, "condition precedent" provisions in the Agreement are enforceable.[12] *Ergonomic Sys. Philippines Inc. v. CCS Int'l Ltd.*, 7 A.D.3d 412, 413-14, 777 N.Y.S.2d 446, 447 (1st Dep't 2004).

LBHI's filing was a failure of a condition precedent, the strict compliance with which was required under the Agreement.[13] If "the occurrence of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies." *Pan Am Corp.*, 175 B.R. at 506, quoting *Wakefield v. Northern Telecom, Inc.*, 769 F.2d 109, 113 (2d Cir. 1985), *modified on other grounds,* 813 F.2d 535 (2d Cir. 1987). Thus, LBHI's filing was a failure of a condition precedent, the strict compliance with which was required under the Agreement. Because the condition precedent was not satisfied, New York contract law provides that Metavante was permitted to withhold the interim payments. *See Ergonomic Sys.*, 7 A.D.3d at 413-414, 777 N.Y.S.2d at 447.

LBHI is an entity distinct from LBSF. Their bankruptcy cases are jointly administered, but are *not substantively consolidated*. LBHI is not a direct party to the Agreement; rather, it is the Credit Support Provider or guarantor for LBSF's obligations thereunder. LBHI has no rights to receive payment under the Agreement, to assume or reject the Agreement or to seek a remedy

---

[12] The Bankruptcy Court also erred in refusing to apply applicable New York law on the impact of the failure of a condition precedent. A court exercising bankruptcy jurisdiction over otherwise state law claims must honor state law unless Congress specifically provides otherwise. *Butner v. United States*, 440 U.S. 48, 53-57 (1979).

[13] A condition is defined as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement (Second) of Contracts § 224 (1981); *Pan Am Corp. v. Delta Air Lines, Inc. (In re Pan Am Corp.)*, 175 B.R. 438, 506 (S.D.N.Y. 1994), 175 B.R. at 506. Failure to satisfy a condition – including any ongoing conditions – relieves the other party of its obligations. *Ergonomic Sys.*, 7 A.D.3d at 413-14, 777 N.Y.S.2d at 447 (if a party fails to satisfy a condition precedent, the other party's performance of its "duties (including the duty to make ... scheduled payments) [does] not become due while [the breaching party is] in breach of the agreement....") (citing Restatement (Second) of Contracts §§ 225, 237) (additional citations omitted).

for the breach of the Agreement. Thus, LBHI, as a guarantor, has no rights to the Agreement that are protectable in LBSF's bankruptcy case.

In a tortured, hyperlinguistic argument below, LBSF asserted that by altering between the definite article "the" and the indefinite article "a" when referring to "case," Congress specifically intended to extend the *ipso facto* prohibitions to include bankruptcy filings of parties other than the subject debtor (*i.e.* "at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on ... (B) the commencement of *a* case under this title"). 11 U.S.C. § 365(e)(1). The overbroadness of this argument makes no sense – any bankruptcy filing, by anyone, anywhere could trigger the *ipso facto* prohibitions in another case. Rather, the references to the filing of "a case" refer not to any bankruptcy case anywhere, but to a case involving this debtor filed under any chapter of the Code. (Congress moved the *ipso facto* provisions from the predecessor of chapter 11 under the Bankruptcy Act to chapter 3 under the Code, applicable to all chapters. *See In re Sapolin Paints, Inc.,* 20 B.R. 497, 499 (Bankr. E.D.N.Y. 1982)).[14]

By ordering Metavante, the non-debtor counterparty, to make payments properly suspended under the Agreement, the court below failed to protect Metavante's interests in the liquidation of its position and offset rights under the Agreement. The Decision Below created a situation where the defaulting party can cynically demand and collect postpetition payments from the non-defaulting party and then reject the swap agreement when interest rates change to the point where the defaulting party might have to pay the non-defaulting party. Moreover, the

---

[14] The bankruptcy filing of a **third party** does not trigger *ipso facto* prohibitions because those prohibitions solely protect the debtor from the enforcement of provisions that deprive the debtor of its contractual rights based upon the debtor's bankruptcy filing. *See Summit Inv. & Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir. 1995), quoting S. Rep. No. 989, 95 Cong., 2d Sess. 59 (1978)); *Liberty Mut. Ins. Co. v. Greenwich Ins. Co.,* 286 F. Supp. 2d 73, 79 (D. Mass. 2003).

defaulting party will likely attempt to keep all of the postpetition payments it has received and

deprive the non-defaulting party of its right to offset its losses, including its loss of bargain and

costs of critical replacement hedges, notwithstanding that the latter's setoff rights are specifically

preserved and protected by the safe harbor provisions.[15]

Despite stating that Metavante cannot "ride the market" unless it is willing to "pay to

play" (RA, Ex. 8, p. 56), the Bankruptcy Court's ruling allows LBSF to do just that. This result

is in complete and inequitable contravention of the purpose of the safe harbor provisions, and

despite the fact that Metavante no longer had the same counterparty and could no longer treat the

Agreement as a hedge under GAAP and without requiring LBSF to adequately protect

Metavante's interests under the Agreement if and when interest rates swing in Metavante's favor.

Non-debtor contract counterparties have a right to protection pending the debtor's

decision to assume or reject. *See McLean Indus., Inc. v. Medical Lab. Automation, Inc. (In re*

*McLean Indus. Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989).

> As the Supreme Court stated, "if the debtor-in-possession elects to continue to
> receive benefits from the other party to an executory contract pending a decision
> to reject or assume the contract, the debtor-in-possession is obligated to pay the
> reasonable value of those services, which, depending on the circumstances of a
> particular contract may be what is specified in the contract."

*R&O Elevator Co. v. Harmon*, 93 B.R. 667, 673 (D. Minn. 1988), citing *N.L.R.B. v. Bildisco and*

*Bildisco*, 465 U.S. 513, 531 (1984).

Case law confirms that, pending assumption or rejection of an executory contract, a

debtor can only enforce the contract if it pays for the value of the material or services it receives.

*Continental Energy Assocs. L.P. v. Hazelton Management Fuel Co. (In re Continental Energy*

---

[15] As a result of the defaults by LBHI and LBSF, Metavante has suffered and will in the future
suffer substantial damages that include (i) added financing and related costs for procuring a
replacement hedges, which already exceed $9 million; and (ii) the legal and other costs incurred
as a result of the defaults.

*Assocs. L.P.)*, 178 B.R. 405, 408 (Bankr. M.D. Pa. 1995). In denying Metavante's request, the Bankruptcy Court ignored the fact that, in cases like *Continental Energy*, courts have held that protection would have been required if the debtor there — like LBSF here — had attempted to 'play' without any assurance that it would also 'pay.' 178 B.R. at 408 ("The only reasonable conclusion is that this court . . . can issue an order that would allow such debtor to enforce the contract until such time that it accepts or rejects the contract, ***provided that** we diligently guard the interests of the non-debtor party to the contract*." (emphasis added)).

The Bankruptcy Court similarly ignored the persuasive policy reasons underpinning the law. As *Continental Energy* explains, "[a]t first glance, the concept that a contract should not be enforceable by either side to a contract until it has been assumed by a debtor makes imminent sense." Indeed, "[i]f it is accepted that the non-debtor party to a contract is stayed from enforcing the terms of that contract on a debtor prior to assumption, then fairness would seem to suggest that the converse should also be true." *Id.* Thus, the fact that a debtor has a *right* to compel postpetition, pre-assumption or rejection performance from a non-debtor already puts the non-debtor at a significant disadvantage from an equities standpoint. Nevertheless, courts permit this level of unfairness in certain, limited situations. But, the Bankruptcy Court went even further — it granted LBSF not only the *right* to compel "gray area" performance, it actually *compelled* Metavante's performance, all without forcing LBSF to give anything up in return for that extra benefit. Because of the added inequity that the Bankruptcy Court's decision would inevitably cause, the *Continental Energy* court roundly rejected such a result, requiring instead that the interests of the non-debtor party to the contract be diligently guarded. By forcing Metavante to perform pending LBSF's decision to assume or reject, and if interest rates have, by that time or anytime thereafter, swung in Metavante's favor, then LBSF should have been forced

to provide some protection that it would pay Metavante for the value LBSF received (*i.e.*, an effective counterparty as a hedge against fluctuating interest rates) during that time.[16]

For the foregoing reasons, Metavante respectfully contends that the Decision Below must be reversed because it was entitled to suspend payments under the Agreement.

**POINT III**

**THE BANKRUPTCY COURT ERRED ON PROCEDURE AND DEFAULT INTEREST**

**A.**     **The Court Should Have Permitted Discovery And Held An Evidentiary Hearing**

The Bankruptcy Court abused its discretion by refusing to allow Metavante to take discovery and submit evidence at a hearing.  If this Court is not inclined to reverse the Decision Below (although it should do so), then at a minimum, Metavante respectfully requests the Court to remand the motion for fact-finding.

In the event of a remand, Metavante would seek to prove non-bankruptcy defaults under the Agreement (*i.e.*, specific indebtedness and cross-default) and the scope and extent of Metavante's set-off claim based on its prudent decision to re-hedge.[17]

The Bankruptcy Court held that Metavante waived its rights under § 560 without taking any evidence on any issue, including waiver.  Consistent with *Orion Pictures Corp. v. Showtime Networks Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099-1102 (2d Cir. 1993), Metavante requested that the Bankruptcy Court schedule a reasonable period of time to conduct discovery,

---

[16] More than 15 months have lapsed since the commencement of LBSF's bankruptcy case, and LBSF has not sought to assume or reject the Agreement. *See In re Beker Indus. Corp.*, 64 B.R. 890, 898 (Bankr. S.D.N.Y. 1986) (non-debtor "is not expected to incur significant added detriment while those who have an interest in the . . . estate are unable to resolve how to deal with an asset").

[17] Metavante's claims include, without limitation, its lost benefit of the bargain, its added costs of funding, and the losses incurred as a result of obtaining and reestablishing its hedge.  In its initial objection, Metavante reserved all of its rights to assert further claims for damages arising out of LBSF's breaches.

followed by an evidentiary hearing.[18] Notwithstanding the significant issues raised in this case — the determination of which will have wide-ranging effects on not only the parties involved in the Lehman Brothers bankruptcies but on the U.S. market as a whole — the Bankruptcy Court chose to rely upon an incomplete record and blind faith in LBSF's assertions to determine that LBSF was entitled to full payment in an amount unilaterally determined by LBSF. The Bankruptcy Court's refusal to permit a reasonable time for the parties to conduct discovery and allow Metavante to submit evidence so the Bankruptcy Court would have had all of the facts before it before ruling constitutes an abuse of discretion. *See Dana Corp.*, 574 F.3d at 148-151 (reversing district court's decision that denied further discovery even though non-moving party was seeking summary judgment and the party seeking discovery had only taken three depositions).

The Bankruptcy Court also abused its discretion by failing to consider all of the evidence that Metavante proffered. For example, the Bankruptcy Court refused to consider evidence establishing that Metavante suffered in excess of $9 million in damages as a result of LBSF's defaults, which should have factored into the Bankruptcy Court's decision as to how much Metavante owed LBSF, if anything. For these reasons, unless the Court reverses the Decision Below (as it should), this matter should be remanded for discovery and an evidentiary hearing.

**B.     The Court Should Have Denied Default Interest Or Required Evidence Of The Proper Amount**

The Bankruptcy Court erred, as a matter of law, in awarding default interest to LBSF notwithstanding LBSF's admitted preexisting defaults under the Agreement. Section 2(e) of the Agreement requires demand be made before a party is entitled to default interest. Although

---

[18] The Bankruptcy Court also erred by not denying the Motion because this matter should have been brought by adversary proceeding. *See* Fed. R. Bankr. P. 7001. The Bankruptcy Court's error results in a further denial of Metavante's due process rights and constitutes an additional reason for reversing the Orders.

LBSF eventually provided a default interest demand, LBSF's failure to provide "fairly contemporaneous" notice that it would be seeking default interest prejudiced Metavante: if Metavante had known "fairly contemporaneously" LBSF would seek default interest despite LBSF's prepetition defaults, that information would have factored into Metavante's decision on whether, when and how to liquidate or terminate the Agreement after LBSF filed, which even the Bankruptcy Court acknowledged Metavante could have done.  RA, Ex. 8, p. 50.

The Bankruptcy Court also abused its discretion in refusing to permit Metavante to challenge the calculation of default interest unilaterally chosen by LBSF.  LBSF never submitted any evidence that supported its interest "calculation."  According to LBSF's "calculation," this rate was 13.5% – an excessively high rate that the Bankruptcy Court accepted without evidence. RA at Ex. 16, p. 14.

More importantly, it remains unclear whether LBSF is even entitled to default interest – and if so, when the clock started running – because LBSF caused the first breach. Accordingly, the Bankruptcy Court abused its discretion in refusing to permit Metavante to challenge the interest calculation unilaterally chosen by LBSF under the Agreement.

For these reasons, if the Decision Below is not reversed (as it should be), then the Court should strike the Bankruptcy Court's award of default interest on remand for a proper determination of the amount.

## CONCLUSION

For the foregoing reasons, the Decision Below should be reversed or, in the alternative, the proceeding should be remanded for fact-finding.

Dated: January 8, 2010

Respectfully submitted,

BAKER & HOSTETLER, LLP

By: /s/  *Richard J. Bernard*
    John Siegal (JS 1036)
    Richard J. Bernard (RB 6371)
    45 Rockefeller Plaza
    New York, NY 10111
    Telephone: (212) 589-4200
    Facsimile: (212) 589-4201
    - and -
    Donald A. Workman
    Washington Square, Suite 1100
    1050 Connecticut Avenue, N.W.
    Washington, D.C. 20036-5304
    Telephone: (202) 861-1500
    Facsimile: (202) 861-1783
    - and -
    Joseph F. Hutchinson, Jr.
    3200 National City Center
    1900 East 9th Street
    Cleveland, OH 44114-3485
    Telephone: (216) 621-0200

    and

    Bruce G. Arnold
    Daryl L. Diesing
    Patrick M. Harvey
    WHYTE HIRSCHBOECK DUDEK S.C.
    555 East Wells Street, Suite 1900
    Milwaukee, WI 53202
    Telephone: (414) 273-2100
    Facsimile: (414) 223-5000

    *Attorneys For Metavante Corporation*