WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Lori R. Fife
Richard W. Slack
Robert J. Lemons
Robert S. Velevis (not admitted in S.D.N.Y)

*Attorneys for Appellee Lehman Brothers Special Financing Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| METAVANTE CORPORATION, | : | |
| | : | |
| Appellant, | : | |
| | : | Case No. 09 CIV. 09839 (JSR) |
| v. | : | |
| | : | |
| LEHMAN BROTHERS HOLDINGS INC., | : | |
| LEHMAN BROTHERS SPECIAL FINANCING | : | |
| INC., | : | |
| | : | |
| Appellees. | : | |

---

## APPELLEE LEHMAN BROTHERS SPECIAL FINANCING INC.'S BRIEF ON APPEAL

---

# TABLE OF CONTENTS

**Page**

I.    Preliminary Statement..................................................................................1

II.   Statement of Facts.....................................................................................4

III.  Argument and Authorities..........................................................................6

   A.   The Bankruptcy Court Appropriately Held That Metavante Must Perform
        Under Its Executory Contract with LBSF............................................7

   B.   Section 560 Does Not Permit Indefinite Suspension of Performance or
        Termination of a Swap Agreement More Than a Year After a Bankruptcy
        Filing .................................................................................................8

      1.   The Court Should Reject Metavante's Attempt to Extend Section
           560 Beyond Its Plain Terms to Allow Metavante to Suspend
           Payments .....................................................................................8

      2.   The Court Should Reject Metavante's Argument That It May
           Terminate the Swap Agreement More Than One Year After
           LBSF's Bankruptcy ...................................................................12

         a.   Case Law Requires Prompt Termination Under the Safe
              Harbor Provisions ..........................................................12

         b.   Legislative History Shows a Clear Intent to Require Prompt
              Termination Under the Safe Harbor Provisions.............................13

   C.   The Court Should Reject Metavante's Attempt to Suspend Payments to
        LBSF Based on the Commencement of LBHI's Chapter 11 Case ........................16

      1.   Metavante's Argument Is Contrary to the Plain Language of the
           Statute .....................................................................................16

      2.   Legislative History Demonstrates That Congress Intentionally
           Selected the "A Case" Language Used in Section 365(e)(1)(B) ..............17

      3.   The Statutory Text and Legislative History Are Supported by
           Strong Policy Considerations..................................................19

   D.   The Bankruptcy Court Appropriately Issued Its Decision as a Matter of
        Law Based on the Undisputed Facts....................................................20

   E.   The Bankruptcy Court Appropriately Held That LBSF Was Not Required
        to Provide Adequate Assurance of Future Performance and That
        Metavante Must Pay Default Interest ..................................................22

   F.   The Court Should Not Consider Metavante's Arguments Relegated to a
        Footnote or Made for the First Time on Appeal ..................................24

IV.   Conclusion and Requested Relief ..........................................................25

# TABLE OF AUTHORITIES

## <u>CASES</u>

*In re Adelphia Bus. Solutions, Inc.*,
    322 B.R. 51 (Bankr. S.D.N.Y. 2005) ...............................................................................21

*In re Amcor Funding Corp.*,
    117 B.R. 549 (Bankr. D. Ariz. 1990) ..............................................................................13

*In re Calpine Corp.*,
    No. 05-60200 (BRL), 2009 WL 1578282
    (Bankr. S.D.N.Y. May 7, 2009) .................................................................................2, 9

*Citizens & S. Nat'l Bank v. Thomas B. Hamilton Co., Inc.*
    *(In re Thomas B. Hamilton Co., Inc.)*,
    969 F.2d 1013 (11th Cir. 1992) .....................................................................................25

*In re Cont'l Energy Ass'n Ltd. P'ship*,
    178 B.R. 405 (Bankr. M.D. Pa. 1995) ...........................................................................23

*Data-Link Sys., Inc. v. Whitcomb & Keller Mortgage. Co., Inc.*
    *(In re Whitcomb & Keller Mortgage. Co., Inc.)*,
    715 F.2d 375 (7th Cir. 1983) ...........................................................................................7

*EBG Midtown S. Corp. v. Mclaren/Hart Envtl. Eng'g Corp.*
    *(In re Sanshoe Worldwide Corp.)*,
    139 B.R. 585 (S.D.N.Y. 1992), *aff'd* 993 F.2d 300 (2d Cir. 1993)....................................21

*In re Enron Corp.*,
    306 B.R. 465 (Bankr. S.D.N.Y. 2004) ............................................................. 3, 9, 10 - 11

*In re Enron Corp.*,
    No. 01 B 16034 (AJG), 2005 WL 3874285
    (Bankr. S.D.N.Y. Oct. 5, 2005) ...............................................................................12, 16

*Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Financing, Inc.*,
    No. 00 Civ. 6739(CBM), 2003 WL 21638214 (S.D.N.Y. July 11, 2003),
    *modified on other grounds*, No. 00 CIV. 6739 (CBM),
    2003 WL 22056983 (S.D.N.Y. Sept. 4, 2003)................................................................24

*Global Crossing Estate Representative v. Winnick*,
    No. 04-Civ 2558(GEL), 2006 WL 2212776
    (S.D.N.Y. Aug. 3, 2006) ...............................................................................................24

*Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*,
    574 F.3d 129 (2d Cir. 2009)............................................................21

*Johnson & Johnson v. Am. Nat'l Red Cross*,
    552 F. Supp. 2d 434 (S.D.N.Y. 2008)..........................................17

*Kopel v. Campanile (In re Kopel)*,
    232 B.R. 57 (Bankr. E.D.N.Y. 1999)............................................21

*MJAC Consulting, Inc. v. Barrett*,
    No. 04 CIV. 6078 (WHP), 2006 WL 2051129
    (S.D.N.Y. July 24, 2006) ..............................................................23

*McLean Indus. Inc. v. Med. Lab. Automation, Inc.*
    *(In re McLean Indus., Inc.)*,
    96 B.R. 440 (Bankr. S.D.N.Y. 1989)..........................................7, 23

*In re Mirant Corp.*,
    314 B.R. 347 (Bankr. N.D. Tex. 2004)........................................9, 13

*N.L.R.B. v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)........................................................................7

*Paddington Partners v. Bouchard*,
    34 F.3d 1132 (2d Cir. 1994)..........................................................21

*In re R.M. Cordova Int'l, Inc.*,
    77 B.R. 441 (Bankr. D. N.J. 1987) ................................................11

*Russello v. United States*,
    464 U.S. 16 (1983)........................................................................17

*United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n (In re UAL Corp.)*,
    346 B.R. 456 (Bankr. N.D. Ill. 2006) ..........................................22

*Vill. Mobile Homes, Inc. v. First Gibraltar Bank, FSB*,
    947 F.2d 1282 (5th Cir. 1991) ......................................................25

*In re Worldcom, Inc.*,
    No. 07 Civ. 3408 (DLC), 2007 WL 2682882
    (S.D.N.Y. Sept. 14, 2007)........................................................11, 25

## **STATUTES**

11 U.S.C. § 365......................................................................................1, 16, 17, 20, 24

11 U.S.C. § 541......................................................................................................17, 18

11 U.S.C. § 555.............................................................................................................12

11 U.S.C. § 556.............................................................................................................12

11 U.S.C. § 559.............................................................................................................12

11 U.S.C. § 560......................................................................................................1, 9, 12

11 U.S.C. § 562.............................................................................................................15

## **Treatises**

38A C.J.S. *Guaranty* § 2................................................................................................20

## I.     PRELIMINARY STATEMENT

This appeal concerns a decision of the Bankruptcy Court, grounded in longstanding precedent, that Metavante Corporation ("Metavante") must continue to perform under an executory contract – in this case, a swap agreement – with Lehman Brothers Special Financing, Inc. ("LBSF"), a chapter 11 debtor, until LBSF determines to assume or reject the contract in accordance with 11 U.S.C. § 365 ("Section 365").

Relying primarily upon 11 U.S.C. § 560 ("Section 560") – the Bankruptcy Code safe harbor provision for swap agreements[1]– Metavante argues that it is entitled to withhold performance.    Section 560 does not excuse Metavante's conduct because that section provides a safe harbor only for the termination, liquidation, or acceleration of a swap agreement following the filing of a bankruptcy petition; it does not permit Metavante to sit back and do nothing for months, or even years, waiting for the markets to turn in Metavante's favor.    The Bankruptcy Court properly rejected Metavante's novel and self-serving construction of Section 560.

Metavante asserts that it need not perform under the swap because Metavante lost an "effective" counterparty as a result of Lehman Brothers' bankruptcy.    Putting aside whether that assertion is factually correct, the Bankruptcy Code provided Metavante with a remedy that it chose not to exercise.    The ability to terminate a swap promptly and to enter into a replacement transaction removes the risk of a bankruptcy to counterparties.    Importantly, as explained below,

---

[1]  Ordinarily, upon the commencement of a case under the Bankruptcy Code, sections 362(a) and 365(e)(1) prohibit creditors from enforcing rights against a debtor.    The so-called "safe harbor" provisions of the Bankruptcy Code, however, generally permit qualifying non-debtor counterparties to exercise certain contractual rights triggered by the commencement of a chapter 11 case or debtor's financial condition, including, under certain conditions, to terminate the contract and accelerate the amounts owed thereunder.    These safe harbors are sections 362(b)(6), (7) and (17); 546(e), (f) and (g); 555; 556; 560; and 561 of the Bankruptcy Code.

the termination mechanism in the swap agreement[2] allows the counterparty to be put in substantially the same economic position (albeit with another counterparty) as if the swap with LBSF had continued.    Thus, Metavante's assertion that the Bankruptcy Court's decision may cause "destabiliz[ation of] the U.S. derivatives market," is without foundation.    (Appellant's Brief ("Brief") at 17 n. 10.)    Counterparties to derivative transactions can, as many Lehman counterparties (other than Metavante) did, terminate and enter into replacement swaps without financial repercussions to the counterparty.    Instead of exercising its protected right under the safe harbor, Metavante elected to "rid[e] the market for the period of one year, while taking no action whatsoever."    (Record on Appeal ("R.A.") 10 at 110:22-23.)

The order below should be affirmed.

First, Metavante's argument that it may suspend payments under an executory contract with a debtor is inconsistent with well-established authority.    The Supreme Court expressly has held that a counterparty must perform under its executory contract with a debtor pending the debtor's determination to assume or reject the contract regardless of whether the debtor has breached the contract.

Metavante relies on Section 560 as justification for its suspension of payments. But Section 560 allows a counterparty to enforce only contractual provisions "to cause the liquidation, termination, or acceleration of one or more swap agreements . . . or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration."    Metavante concedes that it did not terminate the contract, and the safe harbor provisions do not protect rights incidental to the right to liquidate, terminate or accelerate.    *See In re Calpine Corp.*, No. 05-60200 (BRL), 2009 WL 1578282, at

---

[2]  The swap agreement is governed by a standard 1992 International Swap Dealers Association master agreement with a related schedule thereto (the "ISDA Master Agreement") and trade confirmations entered into by the parties.

*6 (Bankr. S.D.N.Y. May 7, 2009); *In re Enron Corp.*, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004). Specifically, Section 560 does not permit a party to suspend payments under an executory contract that has not been terminated.

Second, Metavante's argument that it retained the right to terminate the swap agreement indefinitely after a bankruptcy filing is inconsistent with the language and purpose of Section 560. The intent of Section 560, reflected by its plain language and legislative history, is to permit the *prompt* termination of swaps in order to foster certainty in volatile financial markets. Indeed, the express language of Section 560 requires that the "liquidation, termination, or acceleration" be "because of one or more conditions specified in 365(e)(1)" – here the bankruptcy filings of LBSF and its guarantor, Lehman Brothers Holdings, Inc. ("LBHI"). Metavante's opportunistic delay of over a year demonstrates that any looming termination of the swap would not be "because of" these filings, but instead admittedly would be based on financial market conditions.[3] Metavante's argument that Section 560 provides for an indefinite termination right – long after the bankruptcy filings – would create significant uncertainty in the financial markets, which is the opposite of Congress's intent.

Third, Metavante argues that the Bankruptcy Court misconstrued the prohibition against *ipso facto* provisions in Section 365(e)(1)(B). Section 365(e)(1)(B) prevents the modification of a debtor's contracts based on "the commencement of a case under [title 11]." The Bankruptcy Court read that provision exactly as Congress wrote it and held that LBSF's contractual rights could not be modified based on the bankruptcy of its parent-guarantor, LBHI. There is no reason to look beyond the unambiguous language of the statute. But even if there

---

[3] (*See* R.A. 2 at 11 (arguing that Metavante can "wait as long as it deems appropriate to permit the market to recover").)

were, the legislative history demonstrates Congressional intent that Section 365(e)(1)(B) be

applied beyond the specific debtor's bankruptcy filing.

Fourth, Metavante argues that the Bankruptcy Court erred by not conducting an

evidentiary hearing on the issue of alleged cross defaults.    The Bankruptcy Court correctly

denied this request on numerous grounds.    Metavante did not identify any particular cross

default, and a hypothetical cross default could not have been a legitimate basis for Metavante's

suspension of performance.    It was within the discretion of the Bankruptcy Court not to allow

Metavante to engage in a fishing expedition without any reasonable identification of such cross

defaults.    Moreover, there was no reason for an evidentiary hearing on those issues because,

under applicable law, Metavante must perform its obligations under the swap whether or not

there was a prepetition cross default.    In addition, the cross default provision at issue is not

enforceable under the Bankruptcy Code and well-established authority because it would prevent

LBSF from ever assuming this valuable contract.

Finally, Metavante raises points that were not raised below and/or were raised on

appeal only in a footnote.    The Court should not consider these issues.

## II.    STATEMENT OF FACTS

On December 5, 2007, Metavante and LBSF entered into an interest rate swap

agreement.[4]    The swap required Metavante to make quarterly payments to LBSF based on the

product of a fixed interest rate (3.865%) and a notional amount of $600 million, which declines

over the life of the swap, and required LBSF to make quarterly payments to Metavante based on

the product of a floating interest rate (the three-month USD-LIBOR-BBA rate) and the same

declining notional amount of $600 million.[5]    Payments are made on the same date quarterly on

---

[4]    (*See* R.A. 1 (Ex. 1, Confirmation for the ISDA Master Agr. (fax dated 12/5/2007) at 1).)

[5]    (*See id.* (Ex. 1, Confirmation for the ISDA Master Agr. (fax dated 12/5/2007) at 2, 4).)

a net basis, with only the party owing the larger amount making payment.[6]     As an example, for

the period from August 1, 2008 through November 3, 2008, Metavante's obligation under the

swap was to pay the fixed interest rate of 3.865% multiplied by $600 million, which equaled

$6,055,166.67; LBSF's obligation was to pay the floating rate (which was 2.80063%) multiplied

by the same amount, which equaled $4,387,653.67.     (*See* R.A. 9.)     The netting provisions of

the ISDA Master Agreement resulted in Metavante owing a net payment of $1,667,513.     (*See*

R.A. 1 (Ex. 1, ISDA Master Agr. § 2(c).)     Because interest rates have been lower than 3.865%

since the contract was entered, Metavante has owed LBSF a payment every quarter.

From May 1, 2008 through August 1, 2008, the parties performed their payment

obligations under the swap.     (*See* R.A. 1 at 6.)     Because the LIBOR interest rate was below

3.865% for the calculation period relating to the November 3, 2008, February 2, 2009, and May

1, 2009 quarterly payment dates, Metavante owed LBSF net payments between $1 million and

$4 million for each of these periods.     (*See id.*)     Metavante refused to make any of these

payments, purportedly on the basis of the bankruptcy filings of LBSF and LBHI.     (*See* R.A. 2 at

7-8.)     At the time LBSF filed its motion to compel performance, Metavante owed LBSF more

than $6.6 million plus default interest, and as of October 2009, Metavante owed LBSF more

than $11 million plus default interest.[7]

Section 560 permitted Metavante to terminate the swap agreement promptly upon

the bankruptcy filings, but Metavante chose not to do so.     The parties agreed that the "market

quotation method" under the ISDA Master Agreement would apply to calculate termination

---

[6]  (*See id.* (Ex. 1, ISDA Master Agr. § 2(c) (netting provision to allow parties to offset amounts
owing "on any date amounts would otherwise be payable")).)

[7]  Section 2(e) of the ISDA Master Agreement provides that "a party that defaults in the
performance of any payment obligation will . . . be required to pay interest (before as well as
after judgment) on the overdue amount to the other party on demand . . . at the Default Rate" (as
that term is defined in the ISDA Master Agreement).     (R.A 1 (Ex. 1, ISDA Master Agr. § 2(e)).)

payments upon an early termination of the swap.[8]    The parties also agreed that a defaulting

party would be entitled to a termination payment if the swap was economically favorable to the

defaulting party at the time of termination.    (*See id.*)    Under the "market quotation method,"

had Metavante terminated, it would have been required to obtain "market quotations" from

dealers in the market, *i.e.*, bids for how much these dealers would pay (or demand to be paid) to

be placed into LBSF's shoes under the swap.    (*See id.*)    At the time of LBSF's bankruptcy,

LBSF's position was heavily "in the money" to LBSF because interest rates were below the

fixed amount that Metavante had agreed to pay LBSF.[9]    As a result, any market quotations

should have resulted in dealers being willing to *pay Metavante* a substantial sum to step into

LBSF's shoes and receive the expected cash flow from Metavante.[10]    Under the terms of the

ISDA Master Agreement, Metavante would have paid to LBSF the amount determined through

this market quotation process.[11]    The economic effect of paying a termination payment to LBSF

and replacing the trade with another counterparty should be substantially equal.

## III.    ARGUMENT AND AUTHORITIES

Metavante conceded to the Bankruptcy Court that it wanted to "defer its

termination" and wait for "the markets [to] turn so that Metavante is 'in the money.'"[12]

---

[8]    (*See* R.A. 1 (Ex. 1, ISDA Master Agr. § 6(e); Schedule to ISDA Master Agr. part 1(f)).)

[9]    (*See* R.A. 8, 46:14-15 ("I acknowledge [LBSF was] in the money as of the date of the filing with respect to Metavante.").)

[10]    (R.A. 1 (Ex. 1, ISDA Master Agr. at 15-16 (definitions of "Market Quotation" and "Settlement Amount").)

[11]    (*See* R.A. 1 (Ex. 1, ISDA Master Agr. § 6(e) ("Payments on Early Termination")).)

[12]    (R.A. 2 at 13; *see id.* at 11 (claiming that Metavante was "permitted to wait as long as it deems appropriate to permit the market to recover so that its termination payments upon any such termination will be reduced . . . .").)

Metavante's attempt to avoid paying LBSF based on certain *ipso facto*[13] provisions in the swap should be rejected.   As Judge Peck stated:   "Bankruptcy law is squarely against [Metavante.]" (R.A. 8 at 48:6.)

        **A.**     **The Bankruptcy Court Appropriately Held That Metavante Must Perform Under Its Executory Contract with LBSF**

After Metavante failed to make payments owed under the swap, LBSF moved the Bankruptcy Court for an order compelling Metavante to perform.   Well established principles of bankruptcy law provide that an executory contract with a debtor is enforceable by the debtor against the counterparty, even if there are prepetition defaults.   *See N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *Data-Link Sys., Inc. v. Whitcomb & Keller Mortgage. Co., Inc. (In re Whitcomb & Keller Mortgage. Co., Inc.)*, 715 F.2d 375, 376 (7th Cir. 1983); *McLean Indus. Inc. v. Med. Lab. Automation, Inc. (In re McLean Indus., Inc.)*, 96 B.R. 440, 449 (Bankr. S.D.N.Y. 1989).   As the bankruptcy court in *In re McLean Indus., Inc.* recognized, "a debtor-in-possession's ability to continue to perform and to compel performance with respect to an assumable executory contract is usually the life blood of its reorganization."   96 B.R. at 449.

        Based on this well-settled law, the Bankruptcy Court held that the swap was a "garden-variety" executory contract and that LBSF may enforce it against Metavante pending LBSF's decision to assume or reject the contract.   (R.A. 8 at 109:19-21.)   On appeal, Metavante does not dispute that LBSF generally may enforce its executory contracts pending the decision to assume or reject the contract, whether or not the debtor has breached the agreement. *(See generally* Brief at 21.)   Instead, Metavante argues that swap agreements are somehow exceptional and that a counterparty need not do anything (*i.e.*, neither terminate nor perform)

---

[13]   Generally, *ipso facto* or bankruptcy termination clauses are provisions in executory contracts that automatically terminate the contract or modify a contractual right, or permit the non-debtor contracting party to terminate the contract or modify a contractual right, in the event of bankruptcy.

with respect to a swap agreement after a bankruptcy filing.    (*See, e.g.*, *id.* at 9-10.)    For the

reasons discussed below, this argument is inconsistent with bankruptcy law.

    **B.**    **<u>Section 560 Does Not Permit Indefinite Suspension of Performance or
Termination of a Swap Agreement More Than a Year After a Bankruptcy
Filing</u>**

        Metavante argues that Section 560 allows it to (1) indefinitely withhold

performance under a swap agreement based on the commencement of a bankruptcy case, and (2)

terminate the swap at any time before the agreement would otherwise mature.    Such a reading

of Section 560 distorts the language and purpose of the statute and should be rejected.

        1.    <u>The Court Should Reject Metavante's Attempt to Extend Section 560
Beyond Its Plain Terms to Allow Metavante to Suspend Payments</u>

        Metavante does not dispute that if the Lehman bankruptcies never had occurred,

Metavante would have owed LBSF quarterly payments from October 2008 through the present

(collectively more than $11 million through October 2009).    The issue on appeal is whether the

bankruptcies of LBSF and LBHI alter this obligation.

        The core of Metavante's argument that it may suspend payments is that (1)

section 2(a)(iii) of the ISDA Master Agreement provides for the suspension of payments when

any event of default has occurred and is continuing, and (2) the bankruptcies of LBSF and LBHI

were events of default that justified Metavante's non-performance.    (*See* Brief at 13.)    This

argument ignores the prohibition on *ipso facto* clauses in the Bankruptcy Code, which expressly

renders certain contractual rights of a debtor's counterparty unenforceable and prevents precisely

the result sought by Metavante here.    Specifically, Section 365(e)(1) provides that:

> an executory contract . . . of the debtor may not be terminated or
> modified, and any right or obligation under such contract . . . may not
> be terminated or modified, at any time after the commencement of the
> case solely because of a provision in such contract . . . that is
> conditioned on— (A) the insolvency or financial condition of the
> debtor at any time before the closing of the case; [or] (B) the
> commencement of a case under this title . . . .

8

Under the plain language of Section 365(e)(1)(B), Metavante cannot rely on the filing of a bankruptcy case – such as that of LBSF or LBHI – to alter the contractual rights of LBSF.   Thus, unless Metavante's suspension of payments is permitted by a statutory safe harbor (which, as explained below, it is not), Section 365(e)(1)(B) prevents Metavante from modifying LBSF's rights under the swap agreement by suspending payments to LBSF on the basis of the bankruptcies of LBSF or LBHI (*i.e.*, "the commencement of a case").

Section 560 does not permit or even mention the right to suspend payments on the basis of a bankruptcy filing.   Instead, Section 560 only protects contractual rights "to cause the *liquidation, termination, or acceleration* of one or more swap agreements . . . or to offset or net out any termination values or payment amounts arising under or in connection with the *termination, liquidation, or acceleration*."   11 U.S.C. § 560 (emphasis added).   Every court that has reviewed the safe harbor provisions has held that the safe harbor provisions should be strictly construed such that the safe harbor provisions protect only the narrow right to terminate, accelerate or liquidate, and not other rights incidental to those enumerated rights.   *See In re Calpine Corp.*, 2009 WL 1578282, at *6; *In re Enron Corp.*, 306 B.R. at 473.[14]

In *Calpine*, the bankruptcy court held that a provision in a derivatives contract that required a debtor to dispute a termination calculation within a set period of time was unenforceable and not subject to the safe harbor, even though such a provision clearly related to the counterparty's right to terminate a swap.   2009 WL 1578282, at *6 (safe harbors protect "only those terms that trigger termination upon the occurrence of one of the three specified

---

[14]   Contrary to Metavante's claim on page 12 of its Brief, *In re Mirant Corp.*, 314 B.R. 347, 352 n.10 (Bankr. N.D. Tex. 2004), says nothing about the safe harbor provisions protecting a party's suspension of performance.   *Mirant* simply holds that safe harbor rights come into form immediately and that bankruptcy courts should not hinder counterparties from promptly and properly exercising such rights.   *See id.*   *Mirant* does not expand safe harbor rights beyond the ability to terminate, accelerate or liquidate.

conditions listed in section 365(e)(1) of the Code. . . .    [C]ontractual rights that are merely

ancillary or incidental to an *ipso facto* clause are not enforceable under section 556 of the

Code.").[15]    Similarly, in *Enron*, the bankruptcy court held that filing a state court action to

enforce the right to terminate also was not protected by the safe harbor.    306 B.R. at 473.

Although Metavante argues that the Bankruptcy Court's decision was novel and

unprecedented, even the organization that drafted the form contracts on which most swap

agreements are modeled – the International Swap Dealers Association ("ISDA") – said in a

memorandum to its members (which Metavante placed into the record) that the Bankruptcy

Court's decision was not a "surprise" and that "the U.S. Bankruptcy Code safe harbors . . . speak

only in terms of rights to terminate, net and access collateral.    The careful exercise of section

2(a)(iii) rights may well be viewed as part and parcel of these rights, but it is harder to argue that

the safe harbors protect rights not to terminate and not to pay."    (R.A. 15 at 15 (Memo. from

ISDA Legal Dept.).)

The legislative history of the safe harbor provisions supports this construction.

The purpose of Section 560 was to foster prompt terminations of swap agreements, *see infra* at

13-16, and Metavante cites to nothing in the text of the Bankruptcy Code or the legislative

history that mentions the suspension of payments.    As the bankruptcy court in *Enron*

recognized:

> In enacting section 560, Congress sought to protect financial markets
> from the volatility associated with delaying the final and prompt
> resolution of swap agreements.    *See* H.R. Rep. No. 101-484, at 2
> (1990), U.S. Code Cong. & Admin. News 1990, pp. 223, 224 ("U.S.
> bankruptcy law has long accorded special treatment to transactions
> involving financial markets, to minimize volatility.    Because financial
> markets can change significantly in a manner of days, or even hours, a
> non-bankrupt party to ongoing securities transactions and other

---

[15]  Section 556 of the Bankruptcy Code is a safe harbor for "commodity contracts and forward
contracts" that operates similar to Section 560 for "swap agreements."

> financial transactions could face heavy losses unless the transactions
> are resolved promptly and with finality.").

306 B.R. at 472.

Having not exercised its right to terminate promptly, Metavante tries to

characterize its conduct as falling under the protections of Section 560 by arguing that

withholding performance is a "liquidation" of the swap agreement protected by Section 560.

(*See* Brief at 2, 11-12.)   This argument – that the decision to rehedge and suspend payments is a

liquidation – was not raised below and hence is not appropriate for appeal.   *See In re Worldcom,*

*Inc.*, No. 07 Civ. 3408 (DLC), 2007 WL 2682882, *8 (S.D.N.Y. Sept. 14, 2007) ("Whittaker has

waived this argument by failing to raise it adequately in the bankruptcy court"); (*see generally*

R.A. 2.)   Regardless, this argument turns the meaning of liquidation on its head; caselaw and

legislative history make clear that the right to "liquidate" a derivatives contract is "the right to

close out an open position."   *In re R.M. Cordova Int'l, Inc.*, 77 B.R. 441, 448 (Bankr. D. N.J.

1987) (interpreting right of "liquidation" of a forward contract under section 556 of the

Bankruptcy Code) (citing H.R. Rep. No. 97-420, at 4 (1982), *reprinted in* 1982 U.S.C.C.A.N.

583, 586).   Tellingly, all of the cases cited by Metavante are in the context of liquidation of a

prepetition claim in bankruptcy, not liquidation a financial contract.   (*See* Brief at 11-12.)

By suspending payments, Metavante is not closing out an open position, but rather is doing the

exact opposite by leaving the position open indefinitely.   Indeed, even Metavante recognizes

that to "suspend payments" is different than to "liquidate."   (*See* Brief at 12 (listing supposed

rights to "suspend payments, liquidate, terminate or accelerate and offset").)

Metavante cites the change to Section 560 in the 2005 Bankruptcy Abuse

Prevention and Consumer Protection Act ("BAPCPA") to support its contention that

"suspending payments" is the same thing as "liquidating."   (*See* Brief at 11.)   BAPCPA

clarified that safe harbored counterparties were permitted to net dissimilar safe harbored

contracts against each other.[16]    Before BAPCPA, sections 555, 556 and 559 of the Bankruptcy

Code generally protected the right "to cause the liquidation" of securities contracts, forward

contracts and commodities contracts and repurchase agreements, respectively, whereas section

560 permitted the "termination" of swap agreements.    *Compare* 11 U.S.C. §§ 555, 556 and 559

(2004) *with* 11 U.S.C. § 560 (2004).    Thus, to clarify that parties were permitted to net these

dissimilar safe harbored contracts against each other, Congress conformed the rights in sections

555, 556, 559, and 560 of the Bankruptcy Code uniformly to provide the "[c]ontractual right to

liquidate, terminate, or accelerate."    This change says nothing about "suspending" payments.

Accordingly, Metavante's conduct of withholding performance is not permitted

by the plain meaning, the legislative history, or the case law construing Section 560.

> 2.    The Court Should Reject Metavante's Argument That It May Terminate the Swap Agreement More Than One Year After LBSF's Bankruptcy

>> a.    Case Law Requires Prompt Termination Under the Safe Harbor Provisions

The plain language of Section 560 only permits termination of a swap "because of

a condition of the kind specified in section 365(e)(1)," *i.e.* commencement of a bankruptcy case.

11 U.S.C. § 560.    A termination one year after the commencement would not be "because of"

the LBSF or LBHI bankruptcies, but rather because of some other reason.

The Bankruptcy Court properly agreed with other courts that have found

counterparties that waited too long to terminate their otherwise safe harbored contracts lost their

right to terminate.    *See, e.g., In re Enron Corp.*, No. 01 B 16034 (AJG), 2005 WL 3874285, *4

(Bankr. S.D.N.Y. Oct. 5, 2005) (recognizing that a counterparty's use of the safe harbor

provisions "must be made fairly contemporaneously with the bankruptcy filing" and the failure

---

[16]  *See* H.R. Rep. No. 109-31, at 131 (2005), *reprinted in* 2005 U.S.C.C.A.N. 88, 192 ("The definition of 'master netting agreement' is designed to protect the termination and close-out netting provisions of cross-product master agreement between parties.").

to make such election renders the contract "just another ordinary executory contract"); *In re Amcor Funding Corp.*, 117 B.R. 549, 551, 553 (Bankr. D. Ariz. 1990) (holding that the automatic stay would remain in full force and effect to stay a counterparty's liquidation of a securities contract more than a year after the debtor's bankruptcy filing where counterparty sought to do so "to ease its own bankrupt condition, at the expense of the [debtor's] estate").

Metavante's reliance on *In re Mirant Corp.*, is misplaced.    If anything, *Mirant* supports LBSF's argument here.    In *Mirant*, the court did not hold that safe harbor rights could be exercised in an unlimited amount of time following a bankruptcy filing.    To the contrary, the court found that under the particular facts of that case, the creditor had not waited too long to exercise its safe harbor rights.    *Id.* at 351-52.    The creditor in *Mirant* terminated the contract at issue *seven weeks* into the bankruptcy case (in contrast to fifteen months – and counting – here), and had not terminated the contract earlier only because there was an interim court order that offered incentives not to terminate contracts with the debtor immediately so that the debtor's business might be preserved.    *Id.* at 351-52.    If a counterparty's exercise of safe harbor rights was unlimited in time, then there would have been no reason for the *Mirant* court to consider the facts of that dispute.

> b.    Legislative History Shows a Clear Intent to Require Prompt
> Termination Under the Safe Harbor Provisions

Metavante's claim that "there is no time limit [in the legislative history] and no mention of any need for immediate or contemporaneous termination" (Brief at 15) is demonstrably false.    While Congress did not provide a *specific* deadline for termination, the legislative history is replete with references to "prompt" and "immediate" termination. Construing the termination right as indefinite would defeat the purpose of the legislation.

Congress enacted the safe harbor provisions to maintain liquidity in the financial markets by allowing for the "*prompt* closing out or liquidation of [counterparties'] open

13

accounts" upon the commencement of the debtor's bankruptcy case.    H.R. Rep. No. 97-420, at

1 (1982) (emphasis added).    In 1990, when Congress further broadened the bankruptcy

protections afforded to swap agreements, the rationale was that "[t]he *immediate* termination for

default and the netting provisions are critical aspects of swap transactions and are necessary for

the protection of all parties in light of the potential for rapid changes in the financial markets."

S. Rep. No. 101-285, at 1 (1990) (emphasis added).    "Because financial markets can change

significantly in a matter of days, or even hours, a non-bankrupt party to ongoing securities and

other financial transactions could face heavy losses unless the transactions are resolved *promptly*

*and with finality*."    H.R. Rep. No. 101-484, at 223, 224 (1990) (emphasis added).    In sum, the

legislative history contains numerous statements that Congress expected the safe harbors to be

used "promptly" or "immediately" to terminate swaps and not to wait and play the market

opportunistically.

   Moreover, Metavante misstates the record by claiming that the Bankruptcy Court

gave a supposed "judicial admission that no statutory or Congressional support exists for the

holding below."    (Brief at 9.)    To the contrary, Judge Peck stated that Congress's "stated

rationale that the immediate termination for default and the netting provisions are critical aspects

of swap transactions."    (R.A. 8 at 111:3-12.)    Indeed, at one point in oral argument Judge Peck

told Metavante's counsel that "without a time limit [expressed in the statute] you'll be bound by

issues of waiver and laches *and legislative history*."    (R.A. 8 at 54:6-9 (emphasis added).)

   Metavante is incorrect when it argues that requiring prompt termination "prevents

the non-defaulting party from managing and minimizing its risk of loss, while incurring the

additional, indeed duplicative, economic cost of rehedging" and that requiring prompt

termination will lead to "potentially catastrophic risk caused by the bankruptcy of debtors like

LBSF and LBHI."    (Brief at 16.)    Instead, Metavante's decision to forgo prompt termination

put Metavante into the position of allegedly having multiple hedges and not being able to appropriately manage its risks.

Metavante's citation to testimony before a House subcommittee for the proposition that "Congress clearly was aware that it was not imposing any time constraint when it considered the bill that was originally enacted as § 560" (Brief at 13) is also without merit. That testimony did not involve a time limitation, but rather whether Congress should mandate that all swaps *automatically* terminate upon bankruptcy.[17]    The fact that Congress provided non-debtors a choice whether to terminate (rather than making termination automatic) does not mean that the termination option is of unlimited duration.

Metavante also contends that the statutory scheme of Section 562 of the Bankruptcy Code ("Section 562") "would make no sense if the non-debtor counterparty had a deadline to terminate."    (Brief at 15.)    Section 562 provides rules governing the timing of and procedures for measuring damages in connection with a swap agreement or other safe harbored contracts.    Section 562 generally provides that if a counterparty liquidates, terminates or accelerates, or the debtor rejects, a swap agreement, damages shall be measured as of the earlier of the date of such rejection or the dates of liquidation, termination or acceleration by the counterparty.    *See* 11 U.S.C. § 562.    Contrary to Metavante's unsupported assertion, nothing in Section 562 provides unlimited time for a counterparty to liquidate, terminate or accelerate its contract with the debtor.    Section 562 is applicable to counterparties that promptly terminate their agreements with the debtor as Congress intended.    In that circumstance, Section 562 simply prevents the debtor from rejecting the contract and fixing the petition date or the rejection

---

[17]  *See* Bankruptcy Treatment of Swap Agreements and Forward Contracts:    Hearing on H.R. 2057 and H.R. 1754 Before the SubComm. on Economic and Commercial Law of the H. Comm. on the Judiciary, 101st Cong. 64-65 (testimony of W. Perlstein of Wilmer, Cutler & Pickering), attached hereto as Appendix 1.

date as the date for calculation of damages as opposed to the date that the counterparty properly terminated the contract before such rejection.

C.    **The Court Should Reject Metavante's Attempt to Suspend Payments to LBSF Based on the Commencement of LBHI's Chapter 11 Case**

1.    Metavante's Argument Is Contrary to the Plain Language of the Statute

Metavante next argues that it could suspend payments to LBSF because of the bankruptcy of LBHI.   (*See* Brief at 19.)   The Bankruptcy Court properly held that Metavante could not suspend payments based on the bankruptcy of *either* LBSF or LBHI.

The plain language of the Bankruptcy Code prohibits the enforcement of provisions in a debtor's executory contract based on "the commencement of a case [under title 11.]"   11 U.S.C. § 365(e)(1)(B).   Section 2(a)(iii) of the ISDA Master Agreement falls directly under this provision to the extent it modifies LBSF's rights to receive payments based on the commencement of either LBSF's or LBHI's chapter 11 case.

As an initial matter, Metavante is wrong that the Bankruptcy Court treated the bankruptcy filings of LBSF and LBHI as the "same event."   Rather, the Bankruptcy Court found that Metavante's reliance on either bankruptcy case has the same consequence.   That is, to the extent that either bankruptcy triggered a right under the ISDA Master Agreement to suspend payments, LBSF's contractual rights were modified based upon the "commencement of a case under [title 11]."   Under the plain language of Section 365(e)(1)(B), such a provision is unenforceable.

Moreover, Metavante ignores the overlay of bankruptcy law when it argues that "[u]nder New York contract law, 'condition precedent' provisions . . . are enforceable."   (Brief at 19.)   When LBSF filed for bankruptcy, inconsistent state contract law was preempted by the Bankruptcy Code.   *See, e.g.*, *In re Enron Corp.*, 2005 WL 3874285, at *4.

The Bankruptcy Code is clear that the rights of LBSF to receive performance under the swap agreement may not be modified because of a provision in an executory contract that is conditioned on "the commencement of *a case* under this title."    11 U.S.C. § 365(e)(1)(B) (emphasis added).    This language must be contrasted with the words used by Congress earlier in the same provision.    When Congress intended to refer specifically to the commencement by the specific debtor it used the words "the case."    *See id.* § 365(e)(1) ("any right or obligation under such contract or lease may not be terminated or modified, at any time after commencement of *the case* solely because of a provision in such contract or lease . . . .") (emphasis added).    Thus, applying the plain language used by Congress, the Bankruptcy Code renders ineffective a contractual provision that allowed Metavante to suspend payments based on the commencement of the chapter 11 case of either LBSF or LBHI.    *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each.    We would not presume to ascribe this difference to a simple mistake in draftsmanship.").

2.    <u>Legislative History Demonstrates That Congress Intentionally Selected the "A Case" Language Used in Section 365(e)(1)(B)</u>

Recognizing that the plain language Congress used defeats its argument, Metavante asks this Court to ignore the plain language by claiming that such a reading is "hyperlinguistic."    (Brief at 20.)    Although there is no reason to turn to the legislative history of a statute that is clear on its face,[18] the legislative history demonstrates that Congress chose the language deliberately.    Section 365(e)(1)(B) contains identical language to 11 U.S.C. § 541(c)(1)(B).    And, Congress declined to enact prior drafts of the statute that contained the

_____

[18]  *Johnson & Johnson v. Am. Nat'l Red Cross*, 552 F. Supp. 2d 434, 442 (S.D.N.Y. 2008) (Rakoff, J.) ("When the statutory language is plain and unambiguous, no resort to legislative history can change its meaning.").

language Metavante requests that this Court read into the statute (*i.e.*, prior versions stated that the provisions only applied to "a case under this title *concerning the debtor*").

For instance, in the Ninety-Third and Ninety-Fourth Congresses, a number of bankruptcy bills were introduced that included provisions that a debtor's rights in an executory contract could not be terminated or modified because of "*the commencement of a case* under this Act *by or against the debtor*."[19]    Subsequent bills in the Ninety-Fifth Congress changed the text of these provisions.    Most critically, H.R. 7330 revised section 541(c) to read as follows:

> [A]n interest of the debtor in property becomes property of the estate
> under subsection (a)(1), (2), or (5) of this section notwithstanding any
> provision – . . . (B) that is conditioned on the insolvency or financial
> condition of the debtor, on the commencement of *a case under this title*
> *concerning the debtor*, . . . , and that effects or gives an option to effect
> a forfeiture, modification, or termination of the debtor's interest in
> property.

*Id.* § 541(c) (emphasis added) (paragraphing omitted).

H.R. 7330 was superseded by H.R. 8200, 95th Cong. (introduced July 11, 1977), which included provisions identical to their counterparts in H.R. 7330, with one exception: section 541(c)(1)(B) of H.R. 8200 dropped "concerning the debtor," and instead referred more generally to "the commencement of a case under this title."    In the final version of the bankruptcy bill, which both the House and Senate approved, section 541(c)(1)(B) continued to refer to "the commencement of a case under this title."    124 Cong. Rec. H11,060 (daily ed. Sept. 28, 1978).    Section 365(e), however, was revised, *inter alia*, to add the provisions that are now at section 365(e)(1)(A), (B), and (C), thereby changing the reference to "the commencement of

---

[19]  *See, e.g.*, H.R. 10792, 93d Cong., §§ 4-601(b), -602(b) (introduced Oct. 9, 1973); S. 2565, 93d Cong., §§ 4-601(b), -602(b) (introduced Oct. 11, 1973); H.R. 31, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 14, 1975); S. 235, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 17, 1975) (emphasis added).

*the* case under this title" to "the commencement of *a* case under this title."  *See id.* at H11,055.[20]

Therefore, Congress considered, but ultimately rejected, drafting Section 365(e)(1)(B) in a way

that would have given it the narrow scope that Metavante urges.

Metavante posits its own explanation of the legislative history – that the "a case"

language was inserted into the statute in order to refer "to a case involving this debtor filed under

any chapter of the Code.   Congress moved the *ipso facto* provisions from the predecessor of

chapter 11 under the Bankruptcy Act to chapter 3 under the Code applicable to all chapters."

(Brief at 20.)   This ignores that the statute is applicable to all chapters of the Bankruptcy Code

through the reference to "under this title [*i.e.*, title 11 of the U.S. Code];" not the reference to "a

case."

>        3.    The Statutory Text and Legislative History Are Supported by Strong
>              Policy Considerations

There also are strong policy reasons to construe the statute exactly as Congress

drafted it.   Any interpretation of the Bankruptcy Code that would permit parties to terminate or

modify a contract based on the bankruptcy filing of a closely-related affiliate would allow parties

to easily evade the proscription on *ipso facto* clauses.   As the Lehman bankruptcy and many

other recent corporate bankruptcies have demonstrated, the modern corporate structure often

consists of multiple layers of subsidiaries and affiliates.   Because many such affiliates have

interlinked obligations, if one files for bankruptcy, many more within the corporate chain also

are likely to do so.   Thus, if a party is permitted to enforce a provision that terminated or

modified a contract based on the commencement of a bankruptcy case of a closely related

corporate affiliate, then parties could create *de facto ipso facto* provisions and contract around

important bankruptcy protections.   This Court should not construe the Bankruptcy Code to

---

[20]  Section 365(b)(2)(B) was similarly amended.    *Id.*

create such a gaping loophole and, instead, should construe the Bankruptcy Code according to the words Congress used:    that a party may not deprive a debtor of its contractual rights simply based on the commencement of "a case" rather than "the debtor's case."

Moreover, the provision relied upon by Metavante also is directly connected to the "financial condition" of LBSF, which is a separate reason why it would be impermissible to modify its contract.    *See* 11 U.S.C. § 365 (e)(1)(A).    Similar to Section 365(e)(1)(B), Section 365(e)(1)(A) renders ineffective clauses in executory contracts that modify a debtor's rights due to "the insolvency or financial condition of the debtor at any time before the closing of the case." *Id.*    The sole purpose of LBHI's guaranty of LBSF's performance was to protect against the financial condition of LBSF.    Indeed, a guarantor is needed only if there are concerns regarding the financial condition of the principal obligor and its ability to perform.    *See* 38A C.J.S. *Guaranty* § 2 ("A 'guaranty' is a contract of secondary liability, and a guarantor will be required to make payment only when the primary obligor has first defaulted.").    Absent concerns about the financial condition of LBSF, LBHI's guaranty would be irrelevant.    Therefore, any provision that modifies LBSF's contract rights based on the bankruptcy of LBHI constitutes an unenforceable *ipso facto* provision as to LBSF under Section 365 (e)(1)(A).

**D.    The Bankruptcy Court Appropriately Issued Its Decision as a Matter of Law Based on the Undisputed Facts**

Metavante argues that the Bankruptcy Court erred in not permitting Metavante to take certain discovery and to conduct an evidentiary hearing on the issue of whether LBSF or LBHI had cross defaulted under agreements with other parties.    (Brief at 23-24.)    These arguments should be rejected.

First, it was not an abuse of discretion for the Bankruptcy Court to deny Metavante's request to continue the hearing and permit discovery on whether such a cross default existed because Metavante's contention was and remains mere speculation.    (*See* R.A. 2

20

at 19); *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994) ("A court can reject a request for discovery… if it deems the request to be based on speculation as to what potentially could be discovered.").    Even though Metavante had approximately six weeks between the date that LBSF filed the motion to compel and the hearing date on the motion, Metavante failed to propound any discovery against LBSF, as it had the right to do under Bankruptcy Rule 9014. Metavante also offered no basis at the hearing to support its allegations.    Thus, the Bankruptcy Court properly exercised its discretion to reject Metavante's attempt to delay the hearing and conduct a fishing expedition into all of the Debtors' prepetition indebtedness.    Moreover, Metavante's citation to *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129 (2d Cir. 2009), is distinguishable.    Unlike Metavante, the creditor in *Dana* had made a specific document demand of the debtor, *id.* at 149, and had submitted an affidavit to support its discovery request detailing the specific reasons for the need for additional discovery.    *Id.* at 150.

        In any event, the cross default provision on which Metavante relies does not excuse Metavante's performance pending assumption or rejection of the swap agreement by LBSF and is unenforceable under the Bankruptcy Code.    Cross default provisions are "inherently suspect" under the Bankruptcy Code because they undermine the debtor's ability to assume and assign contracts under section 365(f) of the Bankruptcy Code.    *See EBG Midtown S. Corp. v. Mclaren/Hart Envtl. Eng'g Corp.* (*In re Sanshoe Worldwide Corp.*), 139 B.R. 585, 597 (S.D.N.Y. 1992), *aff'd* 993 F.2d 300 (2d Cir. 1993).    Courts will enforce a cross default provision only if the cross defaulted agreements are so interdependent as to be "necessary" or "essential" or "fundamental" elements of the same transaction.    *See In re Adelphia Bus. Solutions, Inc.*, 322 B.R. 51, 63 (Bankr. S.D.N.Y. 2005) (citing *Kopel v. Campanile (In re Kopel)*, 232 B.R. 57, 67, 67 n.8, 69 (Bankr. E.D.N.Y. 1999)).

This rule prevents, among other things, a counterparty to a debtor's executory contract from requiring a debtor to pay all of its other creditors before it is permitted to assume a valuable executory contract.   The bankruptcy court in *United Air Lines, Inc. v. U.S. Bank Trust Nat'l Ass'n* (*In re UAL Corp.*) explained this rationale:

> For example, a particular supplier of goods to the debtor might provide that its supply contract would terminate upon the debtor's breach of any similar agreement with other specified suppliers.   Such a "pay all" requirement could effectively serve as a proxy for the debtor's insolvency, and, in bankruptcy, it would require the debtor to pay the pre-petition claims of the specified suppliers as a condition for assumption, a daunting undertaking given the rule of equality of distribution recognized and enforced in *Kmart*.   However, the cross-default rule addresses this problem by preventing a debtor from being required to perform contracts substantially unrelated to the one sought to be assumed.

346 B.R. 456, 471 n.13 (Bankr. N.D. Ill. 2006).

The cross default provision on which Metavante relies is unenforceable. Metavante's assertion of a yet unidentified cross default undoubtedly is based on unrelated transactions with unrelated parties, or Metavante would not need "discovery" of such agreements.

Finally, there was no reason to take any evidence on the issue of whether Metavante waited too long to exercise its rights under the safe harbor.   Metavante admitted that it had waited more than a year after the bankruptcies of LBSF and LBHI to see if the market would turn (*see* R.A. 2 at 11), and thus the Bankruptcy Court had the facts it needed to determine this issue.

### E.    The Bankruptcy Court Appropriately Held That LBSF Was Not Required to Provide Adequate Assurance of Future Performance and That Metavante Must Pay Default Interest

Metavante belatedly raised two new arguments in a motion to alter or amend the judgment below:    that the Bankruptcy Court should have required LBSF to provide adequate assurance of future performance and should not have awarded default interest to LBSF.   Neither

of these issues were timely raised below to properly preserve them for appeal.    (*Compare* R.A.

2 *with* R.A. 11 ¶¶ 11, 18.)    Consequently, they should not be considered by this Court.    *See*

*MJAC Consulting, Inc. v. Barrett*, No. 04 CIV. 6078 (WHP), 2006 WL 2051129, *3 (S.D.N.Y.

July 24, 2006) (parties cannot raise new theories on a motion to alter or amend judgment).

Regardless, there is nothing in the law that requires that LBSF provide adequate

assurance of future performance on a contract that has not been assumed.    *See In re McLean*

*Indus., Inc.*, 96 B.R. at 449 (holding that debtor could enforce stock purchase option prior to

assumption or rejection without imposing requirement on debtor to provide adequate assurance

of future performance).    To the contrary, the cases specifically hold that until assumption or

rejection, Metavante has to perform, but LBSF does not.    *See id.* at 449 ("a debtor-in-

possession's ability to continue to perform and to compel performance with respect to an

assumable executory contract is usually the life blood of its reorganization").    Indeed, by

demanding that LBSF provide adequate assurance of future performance of its executory

contractual commitments as a precondition to Metavante's performance, Metavante essentially

seeks to enforce the terms of the agreement against LBSF.    Such a result effectively would strip

LBSF of its right to assume or reject the agreement and would render superfluous Section

365(b)(1)(C) of the Bankruptcy Code, which requires a showing of adequate assurance of future

performance as a condition to assumption of a contract.    Finally, Metavante's discussion of *In*

*re Cont'l Energy Ass'n Ltd. P'ship*, 178 B.R. 405, 408 (Bankr. M.D. Pa. 1995) omits critical

parts of the case.    (Brief at 22.)    The court stated that "*at first glance*, the concept that the

contract should not be enforceable by either side . . . makes imminent sense."    *Id.* at 408

(emphasis added).    But the court went on to say "[t]his approach, however, minimizes the

impact that nonperformance may have on a debtor.    If [the counterparty] refuses [to perform]

pending . . . assumption . . . , then the debtor is effectively prevented from operating until such

time it can negotiate a new source of energy."   *Id.*   In the end, the *Continental* court – just like the Bankruptcy Court – compelled the debtor's counterparty to perform under the contract pending the debtor's decision to assume or reject.   *See id.* at 409.

   Additionally, the Bankruptcy Court was correct in not requiring a hearing on the proper amount of default interest.   Even if Metavante earlier had challenged LBSF's calculation of default interest, which it did not, Metavante "ignores the fact that the ISDA explicitly precludes an issue of fact contest with regard to the proper default rate with the phrases 'without proof or evidence of any actual cost' and 'as certified by it.'"   *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Financing, Inc.*, No. 00 Civ. 6739 (CBM), 2003 WL 21638214, at *2 (S.D.N.Y. July 11, 2003) (quoting ISDA Master Agreement, § 14(d), at 14), *modified on other grounds*, No. 00 CIV. 6739 (CBM), 2003 WL 22056983 (S.D.N.Y. Sept. 4, 2003).   Thus, the agreement executed by Metavante precluded challenge to that amount.   Regardless, in the Bankruptcy Court, LBSF agreed that Metavante could later litigate the issue of default interest, and the amount of default interest is collateral to the decision of the Bankruptcy Court that Metavante must perform under its executory contract while LBSF determines whether to assume or reject the contract.   (*See* R.A. 13 at 4.)   Metavante has not properly raised the issue of default interest in the Bankruptcy Court and the issue is not ripe for adjudication on appeal.

 **F.** **The Court Should Not Consider Metavante's Arguments Relegated to a Footnote or Made for the First Time on Appeal**

   Metavante raises two alleged errors of the Bankruptcy Court only in footnotes. *See* Brief fn 6 (arguing that the swap agreement was a "financial accommodation" contract under Section 365(e)(2)(B)); fn 18 (arguing that the Bankruptcy Court should have considered the matter through an adversary proceeding rather than a contested matter).   Arguments raised only in a footnote are waived on appeal to this Court.   *See Global Crossing Estate Representative v. Winnick*, No. 04-Civ 2558 (GEL), 2006 WL 2212776, *23 (S.D.N.Y. Aug. 3, 2006).   In any

event, while the Bankruptcy Code does not define "financial accommodation," courts that have

construed the term uniformly conclude that it does not refer to "all contracts that involve the

extension of credit; rather it applies to contracts to make loans and other traditional kinds of debt

financing arrangements."    *Citizens and S. Nat'l Bank v. Thomas B. Hamilton Co., Inc. (In re*

*Thomas B. Hamilton Co., Inc.)*, 969 F.2d 1013, 1018-19 (11th Cir. 1992).    A swap agreement is

not an agreement to make a loan, but instead is a complex financial instrument pursuant to which

each of the parties agrees to deliver certain things (which could be cash in different currencies,

securities or goods) to the other party at certain times.

Moreover, Metavante did not even raise the argument made in footnote 18 (that

the motion should have been raised by adversary proceeding) to the Bankruptcy Court, and it is

waived for this reason as well.    *See Village Mobile Homes, Inc. v. First Gibraltar Bank, FSB*,

947 F.2d 1282, 1283 (5th Cir. 1991) ("Compliance with the requisites of an adversary

proceeding may be excused by waiver of the parties."); *In re Worldcom, Inc.*, 2007 WL 2682882,

at *8 (holding that argument was waived on appeal because not raised below).

## IV.    <u>CONCLUSION AND REQUESTED RELIEF</u>

For the foregoing reasons, LBSF respectfully requests that the Court enter an

order affirming the decision of the Bankruptcy Court.

Dated: January 22, 2010
New York, New York

/s/ Richard W. Slack
Lori R. Fife
Richard W. Slack
Robert J. Lemons

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York    10153-0119
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
*Attorneys for Lehman Brothers Special Financing
Inc.*

**<u>Appendix 1</u>**

DOC Y4.J 89/1:101/142

# BANKRUPTCY TREATMENT OF SWAP AGREEMENTS AND FORWARD CONTRACTS

# HEARING

BEFORE THE

## SUBCOMMITTEE ON ECONOMIC AND COMMERCIAL LAW

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ONE HUNDRED FIRST CONGRESS

SECOND SESSION

ON

# H.R. 2057

TO AMEND TITLE 11 OF THE UNITED STATES CODE, THE BANKRUPTCY CODE, REGARDING SWAP AGREEMENTS

AND

# H.R. 1754

TO AMEND TITLE 11, UNITED STATES CODE, WITH RESPECT TO FORWARD CONTRACTS

FEBRUARY 6, 1990

## Serial No. 142



Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

42-119 ≈    WASHINGTON : 1991

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

16

Let us suppose for just a moment that these contractual provisions are not enforced. If the automatic stay barred the nondefaulting party from terminating the outstanding transactions and if he were forced to hold those transactions open, the nondefaulting party could face substantial market exposure, particularly in a volatile market.

Moreover, the nondefaulting party could suffer unexpected and perhaps substantial additional losses if, contrary to the express provisions of the contract, the defaulting party or the bankruptcy trustee could selectively assume certain favorable swap transactions, while rejecting other unfavorable transactions. We call that cherrypicking and imposing cherrypicking losses on nondefaulting parties is contrary to the contractual provisions of the contracts and would materially increase the potential risk associated with all these swap transactions.

ISDA believes that, under the existing statutory provisions of the Bankruptcy Code, netting would be and should be enforced, but this issue has never been expressly addressed by a court and, accordingly, it cannot be entirely free from doubt. If netting is not allowed and if the debtor is permitted to cherrypick, the potential exposure for all swap counterparties is materially increased, and this could undermine the basic foundation of the swap market.

It is for these reasons that ISDA supports enactment of H.R. 2057, to extend the same protections to swaps as those enacted by the Congress in 1982 and 1984 in amendments for securities, commodities, and repurchase agreements.

Thank you.

Mr. BROOKS. Thank you very much.

Mr. Perlstein.

## STATEMENT OF WILLIAM J. PERLSTEIN, WILMER, CUTLER & PICKERING

Mr. PERLSTEIN. Good morning, Mr. Chairman, Mr. Edwards, and Mr. Fish.

My testimony will address how H.R. 2057 resolves three of the principal concerns of swap participants, as they have been described by Mr. Brickell.

These concerns are:

First, the need for assurance that the automatic stay will not bar termination of the agreement and realization on collateral. Otherwise the stay could be found to bar enforcement of contractual rights to terminate a defaulted swap agreement and to prevent the netting of positive and negative exposures by a single counterparty.

Second, the bill provides needed assurance that a trustee could not selectively assume or "cherrypick" individual transactions with a single counterparty, leaving the counterparty unable to set off positive and negative exposures.

Third, the bill provides needed assurance that normal prebankruptcy activities, such as the netting of mutual claims and debts and other ordinary prebankruptcy transfers, will not be later challenged as preferential payments under the Bankruptcy Code.

The automatic stay generally bars any party from taking action to interfere with property of the bankruptcy estate. If a swap

64

the Federal Reserve Board, was announce that it was going to stop paying on all of its long-term debt. That was a default under the swap agreements that M Corp. had with a number of investment banks and commercial banks.

The result of that was, I know personally of at least two cases where counterparties terminated their swap agreements with M Corp., because of the concern that this bill had not been passed. They were concerned that if they kept these swap agreements with M Corp. open, that they would end up with them being viewed as executory contracts when M Corp. finally did enter bankruptcy in March 1989.

So, the effect of not having this legislation, I can tell the chairman because I was involved in both of those cases, was for counterparties to feel they had to terminate, because of a cross-default provision, even though M Corp. had not yet defaulted on its swaps, but because of the cross-default provision, simply because there was no assurance that anybody could give these counterparties, that if they kept the swaps open and M Corp. filed for bankruptcy, as it did, that they would not find that they were stuck in an M Corp. bankruptcy for years. So, there is a concrete example of where the lack of the legislation adversely affected a financially troubled entity, in this case of M Corp.

Mr. BROOKS. Now, you all make an effective argument against allowing a trustee to cherrypick in honoring only those swap agreements advantageous to the debtor, while rejecting others unfavorable to the debtor's estate.

Yet, in section 6 of the bill, the nondefaulting counterparty appears to be given the very same option, to terminate or not to terminate under the terms of the written agreement. Would that not be cherrypicking in reverse? And why should it not be a mandatory netting out of the swap agreements to achieve finality for all parties, not just the bankrupt debtor?

Mr. BRICKELL. It is my understanding that section 6 does not affect the ability of the nondefaulting party to cherrypick.

Mr. BROOKS. He may have that ability?

Mr. BRICKELL. No. All the transactions under the master agreement either remain in effect together or are terminated at the same time, but you cannot treat the different transactions under the master contract differently, whether you are the defaulting party or the nondefaulting party, so the treatment is symmetrical in that sense.

Mr. BROOKS. The bill does not say that exactly. It leaves you a little open.

Mr. PERLSTEIN. If I could respond, Mr. Chairman.

Mr. BROOKS. Precisely, please.

Mr. PERLSTEIN. I will try to be concise. It would be possible for Congress to mandate that all agreements terminate. The problem with that is there are circumstances where you have a financially troubled entity, that a party is willing to enter into a swap with or an executory contract that is properly collateralized. If Congress passes a bill that says, upon bankruptcy, the swap must be terminated, then you are in a situation where you could not, if you saw a financially troubled customer that gave you enough collateral, even if you are willing to enter into a swap and bypass your right

65

to terminate. I can give you an example in 15 seconds. We represented a party that was negotiating with Eastern Airlines before it entered bankruptcy, not the world's most favorite company, but this was to buy some of the Eastern assets. My client knew that there was a real risk of an Eastern bankruptcy and waived the right to terminate its purchase agreement, even if Eastern filed for bankruptcy. We were prepared to go in and buy the assets, notwithstanding the Eastern bankruptcy.

If you amend 560 to say you must terminate, all agreements must terminate upon bankruptcy. I think ISDA would be prepared to say that is fine, if Congress wants to do that, but you do have to realize that means somebody could not deal with a financially troubled company, be willing to give them a swap, get adequate collateral and not have it terminate upon the bankruptcy.

Mr. BROOKS. Mr. Perlstein, H.R. 2057 defines "swap participation" as an entity that has an outstanding agreement on "any day before the date of filing [bankruptcy]. . . ." Doesn't this language create a gap between the day before filing and the actual time of filing on the subsequent day? And in this regard, isn't bankruptcy case law full of instances where the relative rights and remedies depend on the position of the parties at the exact commencement of the bankruptcy case?

Mr. PERLSTEIN. I think that is a fair clarification, Mr. Chairman, and I think maybe the language should be amended to clarify that.

Mr. BROOKS. OK.

Now, we have Ms. Ackermann and Mr. Epling. Forward contracts were first granted special treatment in the 1978 code, and then again received further clarification in the 1984 amendments. Six years later, you are back seeking more definitional clarity. Will H.R. 1754 be the industry's final effort to clarify the bankruptcy treatment of forward contracts?

Ms. ACKERMANN. Well, I don't think anybody can be definitive on this issue, but we believe that everything we are trying to do at this point was contemplated when the original legislation took place. We are trying to deal with the issues that were assumed at that time, so that we will now have a piece of legislation that will be capable of evolving with the times.

Mr. BROOKS. As with the swap agreement legislation, H.R. 1754 seems to grant the forward contract merchant the right to decide whether or not to act to cause liquidation of the contract if a party goes into bankruptcy. For the sake of finality, shouldn't liquidation in such a default situation be mandatory, not left to the discretion of the forward contract merchant?

Ms. ACKERMANN. As in the case of swaps, speaking strictly from the commercial——

Mr. BROOKS. Is this a related issue?

Ms. ACKERMANN [continuing]. I would say that there are serious commercial reasons why one would not want to have the option to liquidate or not to liquidate, as with the example of Eastern Airlines. The same would apply to entering into forward contracts with a financially troubled refiner, for example, in order to secure feed stock for their refinery, with the proper collateral or security, one would enter into those arrangements. If one were forced to go