Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
Robert J. Liubicic
MILBANK, TWEED, HADLEY & M$^{c}$CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

and

David S. Cohen
MILBANK, TWEED, HADLEY & M$^{c}$CLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

:

METAVANTE CORPORATION,                    :

                                                            Case No. 09 CIV. 09839 (JSR)

                        Appellant,               :

v.                                                            :

LEHMAN BROTHERS HOLDINGS INC.      :
et al.,
                        Appellees.              :

---

**APPELLEE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF LEHMAN**
**BROTHERS HOLDINGS INC., ET AL. BRIEF ON APPEAL**

---

## TABLE OF CONTENTS

**PAGE**

JOINDER IN THE DEBTORS' BRIEF ......................................................................................... 1

ARGUMENT ............................................................................................................................... 1

I.    Legislative History Supports the Bankruptcy Court's Holding That the Rights Granted Under Section 560 of the Bankruptcy Code Have a Temporal Limitation......................... 1

II.   Legislative History and Case Law Establish That Section 365(e)(1) of the Bankruptcy Code Applies to the Commencement of LBHI's Bankruptcy Case. ............................... 10

CONCLUSION ......................................................................................................................... 15

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE</u>

### CASES

<u>Benjamin v. Fraser</u>, 343 F.3d 35 (2d Cir. 2003) <u>overruled in part on other grounds by</u> <u>Caiozzo v. Koreman</u>, 581 F.3d 63 (2d Cir. 2009)................................................................................ 14

<u>INS v. Cardoza-Fonseca</u>, 480 U.S. 421 (1987)........................................................................... 15

<u>J.P. Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC</u> (In re Charter Commc'ns), 419 B.R. 221 (Bankr. S.D.N.Y. 2009)................................................................................ 15

<u>Russello v. United States</u>, 464 U.S. 16 (1983)....................................................................... 14, 15

### STATUTES

Pub. L. No. 101-311, 104 Stat. 267 (1990)................................................................................. 5

Pub. L. No. 91-354, § 1(b), 84 Stat. 468 (1970) (Joint Resolution creating the Commission) .... 11

Pub. L. No. 97-222, 96 Stat. 235 (1982).................................................................................... 5

Pub. L. No. 98-353, §§ 391-96, 98 Stat. 364-66 (1984). ............................................................ 5

### OTHER AUTHORITIES

124 Cong. Rec. H11,060 (daily ed. Sept. 28, 1978) ................................................................. 14

128 Cong. Rec. 1262 (1982)....................................................................................................... 6

128 Cong. Rec. 15,981............................................................................................................... 6

<u>Bankruptcy Law and Repurchase Agreements:  Hearing Before the Subcommittee on Monopolies and Commercial Law of the House Judiciary Comm.</u>, 98th Cong. 37 (1984) ........ 7

<u>Bankruptcy of Commodity and Securities Brokers:  Hearings Before the Subcommittee on Monopolies and Commercial Law of the House Judiciary Comm.</u>, 97th Cong. 3 (1981) .......... 5

<u>Bankruptcy Reform: Hearing Before the Subcommittee on Courts of the Senate Judiciary Comm.</u>, 98th Cong. 308 (1983) ............................................................................................ 6, 7

<u>Bankruptcy Treatment of Swap Agreements and Forward Contracts:  Hearing Before the Subcomm. On Economic and Commercial Law of the House Judiciary Comm.</u> 101st Cong. (1990)....................................................................................................................................... 8

H.R. 10792, 93d Cong., § 4-601(b) (introduced Oct. 9, 1973)................................................... 11

H.R. 16643, 93d Cong., § 4-601(b) (introduced Sept. 12, 1974) ............................................... 12

H.R. 31, 94th Cong., § 4-601(b) (introduced Jan. 14, 1975) ...................................................... 12

H.R. 32, 94th Cong., § 4-601(b) (introduced Jan. 14, 1975) ........................................................ 12

H.R. 6, 95th Cong., § 541(c) (introduced Jan. 4, 1977)........................................................ 10, 12

H.R. 7330, 95th Cong. (introduced May 23, 1977) ........................................................ 12

H.R. 8200, 95th Cong. (introduced July 11, 1977)........................................................ 13

H.R. Doc. No. 93-137 (1973) ........................................................ 11

H.R. Rep. No. 101-484 (1990)........................................................ 5

H.R. Rep. No. 109-31 (2005) ........................................................ 7

H.R. Rep. No. 97-420 (1982)........................................................ 6, 8

Hearing Before the Subcommitee on Courts of the Senate Judiciary Comm., 97th Cong. 410 (1982)........................................................ 6

Interest Swap: Hearing Before the Subomm. on Courts and Administrative Practice of the Senate Judiciary Comm. 101st Cong. 8 (1989)........................................................ 8

S. 2266, 95th Cong., (1977) ........................................................ 13

S. 235, 94th Cong., § 4-601(b) (introduced Jan. 17, 1975) ........................................................ 12

S. 236, 94th Cong., § 4-601(b) (introduced Jan. 17, 1975) ........................................................ 12

S. 2565, 93d Cong., § 4-601(b) (introduced Oct. 11, 1973) ........................................................ 12

S. 4046, 93d Cong., § 4-601(b) (introduced Sept. 26, 1974)........................................................ 12

S. Rep. No. 98-65 (1983) ........................................................ 7

S. Rep. No. 101-285 (1990) ........................................................ 7

The American Bankruptcy Institute Survey:  Hearing Before the Subcomm. on Courts and Administrative Practice of the Senate Judiciary Comm., 100th Cong. 665 (1988) ........................................................ 9

Appellant Metavante Corporation ("Metavante") appeals from the ruling, rendered orally on September 15, 2009 (RA, Ex.10) (the "Ruling"), and the related order entered on September 17, 2009 (the "Order"), of the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). For the reasons set forth below and in the brief (the "Debtors' Brief") of the co-Appellees Lehman Brothers Holdings Inc. ("LBHI") and Lehman Brothers Special Financing Inc. ("LBSF"), the Order should be affirmed.

## JOINDER IN THE DEBTORS' BRIEF

To avoid the submission of repetitious statements of fact and legal argument, and to conserve the resources of the Court and the parties, the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc. et al. (the "Committee") joins in the Debtors' Brief. The Committee hereby adopts and incorporates by reference the arguments set forth in the Debtors' Brief in their entirety, and sets forth below only a supplemental argument to address two issues of particular concern to the Committee.

## ARGUMENT

**I.    Legislative History Supports the Bankruptcy Court's Holding That the Rights Granted Under Section 560 of the Bankruptcy Code Have a Temporal Limitation**

In the Ruling, the Bankruptcy Court held that, (1) in enacting section 560, Congress intended "for the prompt closing out or liquidation of open accounts upon the commencement of a bankruptcy case" and (2) Metavante's "conduct of riding the market for a period of one year, while taking no action whatsoever, is simply unacceptable and contrary to the spirit of [section 560] of the Bankruptcy Code." RA, Ex. 10, at 110-111 (emphasis added). Metavante asserts that "[t]his legal determination is contrary to . . . Congressional intent as evidenced in the legislative history" (Appellant Br. at 1), stating: "the court below engaged in a

truncated and highly-selective one paragraph legislative history analysis that totally distorts the extensive two decade Congressional record on this point" (Id. at 9).  Metavante elaborates on these assertions in Point I(C) of its brief, in which it asserts that "the legislative history shows the [section 560] safe harbor has no time limitation."  (Id. at 15 (capitalization omitted)).  The legislative history, however, shows the opposite of what Metavante asserts.

Section 560 was enacted in 1990[1] as part of a set of amendments to the Bankruptcy Code that were based on amendments to the Bankruptcy Code in 1982[2] and 1984[3] that were designed to provide special protection "to other similar types of financial agreements, including repurchase agreements, securities contracts, commodities contracts, and forward contracts."  Bankruptcy Treatment of Swap Agreements and Forward Contracts, H.R. Rep. No. 101-484, at 1 (1990); see id. at 2-3.  The 1982 and 1984 amendments enacted (1) sections 555 (liquidation of securities contracts) and 556 (liquidation of commodities contracts), and (2) section 559 (liquidation of repurchase agreements) of the Bankruptcy Code, respectively, each of which is a counterpart of section 560.

The legislative history of the 1982 and 1984 amendments shows that the purpose of sections 555, 556, and 559 was to enable the counterparties that were protected by those provisions to close out their contracts immediately or promptly after the commencement of a debtor's bankruptcy case.  See Bankruptcy of Commodity and Securities Brokers:  Hearings Before the Subcommittee on Monopolies and Commercial Law of the House Judiciary Comm., 97th Cong. at 3 ("to take the bankrupt customer out of the market and to take him out fast"), 26 ("close out positions rapidly in a customer bankruptcy"; "prompt liquidation"), 44 ("closing out

---

[1]    Pub. L. No. 101-311, 104 Stat. 267 (1990).
[2]    Pub. L. No. 97-222, 96 Stat. 235 (1982).
[3]    Pub. L. No. 98-353, §§ 391-96, 98 Stat. 364-66 (1984).

of a customer position immediately upon such customer's bankruptcy"), 166 ("If a party goes

bankrupt, its contracts must be liquidated as quickly as possible"), 212 ("This provision . . .

would ensure that that in the case of a commodity-related bankruptcy, other parties in the

clearing chain can immediately arrest any domino effect by freezing the status quo, immediately

transferring or liquidating open positions"), 249  ("Clearing agencies and brokers limit the

potential market risks they face from the possible insolvency of brokers and customers . . . by

acting promptly upon learning that a participant obligated to them has become insolvent to close

out the insolvent's open positions . . . and thereby 'hedge' their own position to prevent their loss

exposure from increasing as market prices continue to move."), 303 ("immediately close out the

securities positions of an insolvent participant"), 307 ("liquidate rapidly"), 318 ("close out the

securities positions of a debtor immediately upon discovery of the debtor's insolvency"), 373 ("it

is essential that stockbrokers and securities clearing agencies be able to freeze the status quo by

promptly liquidating the customer's positions"), 379 ("immediately close out the open valued

positions"), 382 ("any delay in closing out open positions could be disastrous"), 490 ("promptly

close out open positions"), 491 ("It is essential that these transactions be closed out immediately

without anyone being put to the additional market risk.") (1981); H.R. Rep. No. 97-420, at 2

(1982) ("prompt closing out or liquidation of such open accounts"); 128 Cong. Rec. 1262

(1982)(statement of Rep. Edwards)("prompt closing out or liquidation of such open accounts");

128 Cong. Rec. 15,981 (statement of Sen. Dole)("prompt liquidation of an insolvent's

positions"); Hearing Before the Subcommitee on Courts of the Senate Judiciary Comm., 97th

Cong. 410 (1982) ("timely and effective liquidation of repos"); Bankruptcy Reform:  Hearing

Before the Subcommittee on Courts of the Senate Judiciary Comm., 98th Cong. 308

("immediately liquidate their repo transactions in the market and cut the risk of loss as soon as

the received word of a dealer's insolvency"), 326 ("prompt liquidation of an insolvent's position"), 337 ("timely and effective liquidation of repos") (1983); S. Rep. No. 98-65, at 72 (1983) ("prompt liquidation of an insolvent's position"); <u>Bankruptcy Law and Repurchase Agreements:  Hearing Before the Subcommittee on Monopolies and Commercial Law of the House Judiciary Comm.</u>, 98th Cong. 37 ("liquidate the securities immediately upon the insolvency of the other party"), 41  ("ability to liquidate repo securities quickly"), 71 ("liquidate their investment promptly") (1984).

The legislative history of section 560 is to the same effect.  Congress enacted section 560 with the intent that a swap participant would exercise its rights under that provision immediately or promptly after the commencement of a bankruptcy case.   As explained in H.R. Rep. No. 109-31, pt. 1, at 111 (2005), <u>reprinted in</u> 2005 U.S.C.C.A.N. 88, 193,  2005 WL 832198:  "For the purposes of Bankruptcy Code sections 555, 556, 559, 560, and 561, it is intended that the normal business practice in the event of a default of a party based on bankruptcy or insolvency is to terminate, liquidate or accelerate . . . swap agreements . . . with the bankrupt or insolvent party." <u>See</u> <u>also</u> <u>Swap Agreements and Forward Contracts</u>, S. Rep. No. 101-285, at 3-4 (1990) ("immediate termination for default"; "immediate termination of outstanding transactions"; "prompt termination of the agreement"; "immediate termination and netting").  Moreover, as further noted by the International Swap Dealers Association during the 1988 Hearing, "a prudent counterparty would immediately terminate all transactions with a debtor so as to fix its exposure and would simultaneously enter into separate transactions to hedge that exposure."  1988 Hearing at 681 (statement of International Swap Dealers

7

Association).  This sentiment was echoed during the hearings in 1989[4] and 1990.[5]  See 1989

Hearing at 26 (statement of Mark C. Brickell) (" a prudent counterparty would immediately

terminate all transactions with a debtor so as to fix its exposure"), 37 (statement of Paul Allan

Schott, Office of the Comptroller of the Currency) ("immediate liquidation of a swap agreement

when one party went into default"), 48 (statement of Federal Reserve Staff) ("give immediate

effect to the termination provisions of the swap agreement upon the commencement of a case

under the Code"), 132 (statement of Don Comer) ("ability to immediately terminate");  1990

Hearing at 31 (statement of Mark C. Brickell and William J. Pearlstein) ("Following a default,

and absent a stay, a prudent counterparty would immediately terminate all [swap] transactions

with a debtor . . . .").

       Thus, as the Bankruptcy Court noted in the Decision Below, "legislative history

evidences Congress's intent to allow for the prompt closing out or liquidation of open accounts

upon the commencement of a bankruptcy case. . . . The [Congressional History's] . . . stated

rationale [is] that the immediate termination for default and the netting provisions are critical

aspects of swap transactions and are necessary for the protection of all parties in light of the

potential for rapid changes in the financial markets."  RA, Ex. 10, at 111 (citing H.R. Rep. No.

97-420, at 1 (1982), and S. Rep. No. 101-285, at 1 (1990) (emphasis added)).

       The rights granted to swap participants in section 560 of the Bankruptcy Code

were based on the concern that a swap participant could be exposed to market risk if (1) its

counterparty became a debtor in a case under the Bankruptcy Code and (2) the automatic stay (a)

---

[4]     Interest Swap: Hearing Before the Subomm. on Courts and Administrative Practice of the Senate Judiciary Comm. 101st Cong. 8 (1989) [hereinafter "1989 Hearing"].

[5]     Bankruptcy Treatment of Swap Agreements and Forward Contracts:  Hearing Before the Subcomm. On Economic and Commercial Law of the House Judiciary Comm. 101st Cong. (1990) [hereinafter "1990 Hearing"].

prevented the swap participant from terminating the swap agreement, and thereby (b) forced the swap participant to be subjected to the risks of being a party to an open swap agreement with the debtor, including the risk that the debtor would "play the market" against the swap participant by assuming or rejecting the swap agreement depending on how the market moved after the commencement of the debtor's bankruptcy case.  See, e.g., The American Bankruptcy Institute Survey:  Hearing Before the Subcomm. on Courts and Administrative Practice of the Senate Judiciary Comm., 100th Cong. 665 (1988) [hereinafter "1988 Hearing"] (statement of Richard F. Kezer, Public Securities Association) ("avoid inequitable decisions by a trustee in bankruptcy to assume favorable swap transactions while rejecting unfavorable transactions").   During the 1988 Hearing, the International Swap Dealers Association noted that "[t]he nondefaulting party could face substantial market exposure if the automatic stay barred it from terminating all outstanding transactions and forced it to hold open all transactions with the debtor, particularly in a volatile market."  Id. at 679 (statement of International Swap Dealers Association).  Furthermore, "[a]ny delay in obtaining authority to terminate outstanding transactions . . . would create unreasonable risks for the nondefaulting party. . . . [and] [t]he possibility that the automatic stay could prevent such termination – possibly for weeks or months – creates a threat of a substantial increase in the nondefaulting party's potential exposure to the debtor and generally complicates any effort to hedge that exposure."  Id. at 681; see id., at 682 (noting the costs and risks to a nondefaulting party arising from "the uncertainty as to whether the transaction will be assumed").  In enacting the section 560, however, Congress did not intend to grant non-defaulting swap counterparties to forestall exercising their rights to "play the market," thus causing harm to a debtor.

II.    **Legislative History and Case Law Establish That Section 365(e)(1) of the Bankruptcy Code Applies to the Commencement of LBHI's Bankruptcy Case**

The Bankruptcy Court properly applied the protections of section 365(e)(1) of the Bankruptcy Code to LBSF for the purposes of determining Metavante's rights. Metavante asserts that the commencement of LBHI's Chapter 11 case did not trigger the protections of section 365(e)(1) in LBSF's case. Specifically, Metavante asserts that section 365(e)(1)'s reference to "a case" refers to a case involving this debtor – here, LBSF – filed under any chapter of the Code, not "any bankruptcy case anywhere." (Appellant Br. at 20.) Metavante further asserts that Congress did not intend to extend the *ipso facto* provisions to include bankruptcy filings of parties other than the subject debtor – in this case, LBHI. (Id.) The legislative history of section 365(e)(1) and the relevant case law, however, contradict Metavante's assertions.

The Bankruptcy Code protects LBSF's property rights from being deprived based on LBHI's bankruptcy filing, whether that filing preceded or followed LBSF's own bankruptcy filing. Specifically, the legislative history of section 365(e)(1)(B) and a comparable provision, section 541(c)(1)(B), establishes that Congress considered restricting the protections to *ipso facto* clauses triggered by "the commencement of a case under this title concerning the debtor," see, e.g., H.R. 6, 95th Cong. § 541(c) (introduced Jan. 4, 1977) (emphasis added), but ultimately rejected that language in favor the broader language of 11 U.S.C. §§ 541(c)(1)(B) and 365(e)(1)(B) that includes the filing of "a case."

The statutory prohibitions on *ipso facto* provisions in sections 365(e)(1) and 541(c)(1)(B) originated in the work of the Commission on the Bankruptcy Laws of the United States (the "Commission"), which was formed to "study, analyze, evaluate, and recommend changes to" the Bankruptcy Act of 1898. See Pub. L. No. 91-354, § 1(b), 84 Stat. 468 (1970)

10

(Joint Resolution creating the Commission). On June 30, 1973, the Commission filed a two-part report with Congress. The first part, H.R. Doc. No. 93-137, pt. 1 (1973), consisted of "an analysis and evaluation of the present system of bankruptcy administration in the United States and [the Commission's] recommendations for changes therein to reflect and adequately meet the demands of present technical, financial, and commercial activities." Id. at Letter of Transmittal. The second part, H.R. Doc. No. 93-137, pt. 2 (1973), consisted of "the text of proposed statutory changes to effect [the Commission's] recommendations, including a new 'Bankruptcy Act of 1973.'" Id. at Letter of Transmittal.

Section 4-601 of the Commission's Proposed Bankruptcy Act of 1973 (the "Proposed Act"), titled "Property of the Estate," included the following provision: "Invalidity of Certain Restrictions and Forfeitures. Any prohibition on the transfer of property by the debtor and any provision for forfeiture or termination conditioned on *the filing of a petition* are unenforceable as to property of the estate . . . ." Id. § 4-601(b) (emphasis added). Section 4-602 of the Commission's Proposed Act, titled "Executory Contracts and Unexpired Leases," included a subsection, titled "Unenforceability of Certain Contractual Provisions," that limited the enforceability of "[a] provision in a contract or lease, or in any law applicable thereto, which terminates or modifies, or permits a party other than the debtor to terminate or modify, the contract or lease because of the insolvency of the debtor or *the commencement of a case* under this Act *by or against the debtor*." Id. § 4-602(b) (emphasis added).

In the Ninety-Third and Ninety-Fourth Congresses, a number of bankruptcy bills were introduced that included, verbatim,[6] these provisions of the Commission's Proposed Act.[7]

---

[6]     One exception, which is not relevant here, is that in their proposed section 4-602(b), most of these bills used the words "under this title" rather than "under this Act".

[7]     See H.R. 10792, 93d Cong., §§ 4-601(b), -602(b) (introduced Oct. 9, 1973); S. 2565, 93d

Subsequent bills in the Ninety-Fifth Congress, however, used new section numbers for, and changed the text of, these provisions. The first was H.R. 6, 95th Cong. (introduced Jan. 4, 1977), which included the following provisions:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease may not be terminated or modified, and any right or obligation under an executory contract or unexpired lease may not be terminated or modified, at any time because of – (1) the insolvency or financial condition of the debtor at any time before the closing of the case; (2) *the commencement of the case under this title*; or (3) the appointment of or taking possession by a custodian before such commencement.

Id. § 365(e) (emphasis added) (paragraphing omitted).

> An interest of the debtor in property becomes property of the estate under subsection (a)(1), (2), or (5) of this section notwithstanding any provision – (1) that restricts or conditions transfer of such interest by the debtor; or (2) that is conditioned on the insolvency or financial condition of the debtor, on *the commencement of a case under this title concerning the debtor*, or on the appointment of or the taking possession by a custodian, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

Id. § 541(c) (emphasis added) (paragraphing omitted).

A subsequent, superseding bill, H.R. 7330, 95th Cong. (introduced May 23, 1977), revised section 365(e) to read as follows:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease, other than a contract or lease of the kind specified in subsection (c) of this section, may not be terminated or modified, and any right or obligation under an executory contract or

---

Cong., §§ 4-601(b), -602(b) (introduced Oct. 11, 1973); H.R. 16643, 93d Cong., §§ 4-601(b), -602(b) (introduced Sept. 12, 1974); S. 4046, 93d Cong., §§ 4-601(b), -602(b) (introduced Sept. 26, 1974); H.R. 31, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 14, 1975); H.R. 32, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 14, 1975); S. 235, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 17, 1975); S. 236, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 17, 1975).

> unexpired lease, other than a contract or lease of the kind specified in subsection (c) of this section, may not be terminated or modified, at any time after the commencement of the case solely because of *a default of a kind specified in [section 365(b)(2)]*.

Id. § 365(e) (emphasis added) (paragraphing omitted).  Section 365(b)(2), in turn, specified the following kinds of default:  "the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the *commencement of the case* under this title; or (C) the appointment of or taking possession by a custodian before such commencement."  Id. § 365(b)(2) (emphasis added).  Significantly, H.R. 7330 revised section 541(c) to read as follows:

> (1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (2), or (5) of this section notwithstanding any provision – (A) that restricts or conditions transfer of such interest by the debtor; or (B) that is conditioned on the insolvency or financial condition of the debtor, on *the commencement of a case under this title concerning the debtor*, or on the appointment of or the taking possession by a custodian, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.  (2)  A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

Id. § 541(c) (emphasis added) (paragraphing omitted).

H.R. 7330 was superseded by H.R. 8200, 95th Cong. (introduced July 11, 1977), which included (see id. §§ 365(b)(2), (e), 541(c) ), provisions identical to their counterparts in H.R. 7330, with one exception:  whereas section 541(c)(1)(B) of H.R. 7330 referred to "the commencement of a case under this title *concerning the debtor*" (emphasis added), section 541(c)(1)(B) of H.R. 8200 dropped "concerning the debtor," and instead referred more generally to "the commencement of a case under this title."

Sections 365(e) and 541(c) of (1) S. 2266, 95th Cong. (1977), as introduced in the Senate on October 31, 1977, and reported on July 14 and August 10, 1978, respectively, and (2)

13

the versions of H.R. 8200 that were reported and passed by the House on September 8, 1977, and February 8, 1978, respectively, all tracked, in relevant part, their counterparts in the original version of H.R. 8200. In particular, in each of these four subsequent bills, (1) section 365(e), incorporating section 365(b)(2)(B) by reference, applied to a default that was a breach of a provision relating to "the commencement of *the* case under this title" (emphasis added), and (2) section 541(c)(1)(B) referred to "the commencement of *a* case under this title." (emphasis added).

In the final version of the bankruptcy bill, which both the House and Senate agreed to and approved, section 541(c)(1)(B) continued to refer to "the commencement of *a* case under this title." See 124 Cong. Rec. H11,060 (daily ed. Sept. 28, 1978). Section 365(e), however, was revised (1) to eliminate the reference to section 365(b)(2), and (2) to add the provisions that are now at section 365(e)(1)(A), (B), and (C), thereby changing the reference to "the commencement of *the* case under this title" to "the commencement of *a* case under this title." See id. at H11,055. Section 365(b)(2)(B) was similarly amended. Id.

The substitution of "a case" for "the case" is a significant indication of Congressional intent. In Benjamin v. Fraser, the Second Circuit noted that "[w]ell-settled principles of statutory construction dictate that '[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended.'" Benjamin v. Fraser, 343 F.3d 35, 46 (2d Cir. 2003), overruled in part on other grounds by Caiozzo v. Koreman, 581 F.3d 63 (2d Cir. 2009),[8] (quoting Russello v. United States, 464 U.S. 16, 23 (1983)). The Second Circuit went on to explain that "[f]ew principles of statutory construction are more compelling than the proposition that Congress does not intend

---

[8]    Fraser was overruled on a point that is not relevant to the legislative history analysis.

*sub silentio* to enact statutory language that it has earlier discarded in favor of other language." Id. at 46-47 (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 442-43 (1987)).

This interpretation of the legislative history is further supported by the treatment of cross-default provisions in bankruptcy. "[A] determination to enforce a cross-default provisions is necessarily fact-specific." J.P. Morgan Chase Bank, N.A. v. Charter Commc'ns Operating, LLC (In re Charter Commc'ns), 419 B.R. 221, 251 (Bankr. S.D.N.Y. 2009) (Peck, J.). In an "integrated enterprise . . . the financial condition of one affiliate affects the others." Id. In Charter, the Court held that an event of default with "respect to a holding company was necessarily connected both factually and contractually to the financial condition of" its affiliate, thus rendering a cross-acceleration event of default an *ipso facto* default "that either is ineffective and unenforceable or does not need to be cured." Id. The financial conditions of LBHI and LBSF are similarly linked. Thus, any analysis under section 365(e)(1)(B) must account for this integrated enterprise and recognize that a filing by LBHI must necessarily invoke the protections of 365(e)(1)(B).

In sum, (1) the legislative history of sections 365(e)(1)(B) and 541(c)(1)(B) demonstrates that Congress considered, but ultimately rejected, drafting those provisions in a way that would have given them the narrow scope that the Metavante seeks to impose, and (2) case law supports the conclusion that section 365(e)(1) applies to the commencement of LBHI's Bankruptcy Court.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court uphold the decision of the Bankruptcy Court, and deny Metavante's appeal.

Dated:   New York, New York
         January 22, 2010


**MILBANK, TWEED, HADLEY & McCLOY LLP**

By:  Robert J. Liubicic                           
Dennis Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
Robert J. Liubicic

1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

David S. Cohen
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.