John Siegal (JS 1036)
Richard J. Bernard (RB 6371)
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201

*Attorneys for Appellant Metavante Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| METAVANTE CORPORATION, | : <br> : |
| Appellant, | :    Case No. 09 CIV. 09839 (JSR) <br> : |
| v. | : <br> : |
| LEHMAN BROTHERS HOLDINGS INC., *et al.*, | : <br> : |
| Appellees. | : <br> : |

**APPELLANT METAVANTE CORPORATION'S REPLY BRIEF ON APPEAL**

**Table of Contents**

Page

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT .......................................................................................................................... 2

POINT I: APPELLEES CITE NO CONTROLLING AUTHORITY TO SUPPORT THEIR CONTENTION THAT METAVANTE HAD TO ACT IMMEDIATELY ...................... 2

    A.   The Debtor's Economic Assumptions Are Incorrect And Beyond The Record .................................................................................................................... 2

    B.   The Opposition Is Built Around Legal Assertions That Lack Any Support .......... 4

    C.   Congress Did Not Intend To Permit Bankrupt Swap Participants To Control The Liquidation Of Arrangements Caused By Their Own Defaults ........ 6

        1.   Congress Chose Not To Mandate Automatic Termination Or Time Restrictions On Swap Agreements In The Event Of A Bankruptcy Default ................................................................................................ 6

        2.   LBHI's Bankruptcy Filing Did Not Trigger Section 365(e)(1)(B) In LBSF's Bankruptcy Case ...................................................................... 8

POINT II: METAVANTE ACTED WITHIN ITS STATUTORY RIGHTS TO LIQUIDATE, OFFSET, AND NET OUT ITS POSITIONS UNDER THE SWAP AGREEMENT ....... 9

CONCLUSION ...................................................................................................................... 10

# TABLE OF AUTHORITIES

Page

**Cases**

*Calpine Energy Services, L.P. v. Reliant Energy Electric Solutions, L.L.C. (In re Calpine Corp.),*
   Case. No. 05-60200 (BRL), 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) ................. 6, 7
*Citizens and S. Nat'l Bank v. Thomas B. Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.),* 969 F.2d 1013 (11th Cir. 1992) .................................................................................... 6
*Enron Australia v. TXU Electricity* (2003) 180 F.L.R. 376 ............................................................ 9
*Ford v. Bernard Fineson Dev. Ctr.,* 81 F.3d 304 (2d Cir.1996) .................................................... 11
*In re Amcor Funding Corp.,* 117 B.R. 549 (D. Ariz. 1990) ........................................................... 6
*In re McLean Indus., Inc.,* 30 F.3d 385 (2d Cir. 1994) ................................................................. 11
*In re Mirant Corp.,* 314 B.R. 347 (Bankr. N.D. Tex. 2004) ........................................................... 5
*J.P. Morgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re Charter Communications),* 419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................. 9, 10
*N.L.R.B. v. Bildisco and Bildisco,* 465 U.S. 513 (1984) ............................................................. 4, 5

**Statutes**

11 U.S.C. § 362(b) ......................................................................................................................... 9
11 U.S.C. § 365 .............................................................................................................................. 9
11 U.S.C. § 365(b) ......................................................................................................................... 8
11 U.S.C. § 365(e) .............................................................................................................. 5, 8, 9, 10
11 U.S.C. § 541(c) ...................................................................................................................... 8, 9
11 U.S.C. § 555 .............................................................................................................................. 6
11 U.S.C. § 556 .............................................................................................................................. 6
11 U.S.C. § 560 ...................................................................................................................... passim

**Other Authorities**

Debtors' Objection To The Motion Of The California Public Employees' Retirement System For An Order Pursuant To 11 U.S.C. §§ 362 And 553 For Relief From The Automatic Stay To Effect A Non-Mutual Setoff, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Nov. 24, 2009) ............................................................................................... 10
*Establishing resolution arrangements for investment banks,* HM Treasury, December 2009 ....... 9

**Legislative Materials**

A&P Cong. Rec. S17403 (1978) ................................................................................................... 10
*Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing on H.R. 2057 and H.R. 1754 Before the Subcomm. on Economic and Commercial Law of the H. Comm. on the Judiciary,* 101st Cong. (1990) ................................................................................................. 8
*Too Big to Fail: The Role for Bankruptcy and Antitrust Law in Financial Regulation Reform: Hearing* Before *the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 111th Cong. (2009) ................................................................................................... 2

**PRELIMINARY STATEMENT**

The fundamental question for this Court is which party gets to decide when to liquidate and set off the parties' positions under the interest rate swap Agreement. The Debtor-Appellee, LBSF, never says so in its brief, but it is actually seeking to play the market by deferring its own decision to assume or reject the Agreement while contending that Metavante had to make an immediate decision to terminate or not. LBSF—the defaulting party whose bankruptcy caused the problem—devotes its entire opposition brief to attacking Metavante's right to control the timing of liquidation, termination, acceleration, netting or setoff in order to usurp for itself the right to ride the market and control the liquidation timing that both the Bankruptcy Code and the Agreement confer on Metavante. The Court must reject LBSF's money-grabbing double-standard and restore the contractual and statutory balance that authorizes Metavante, the non-defaulting party, to control when and how to settle-up under the Agreement, subject to LBSF's right to reject the Agreement or, if it can, to cure the defaults, provide adequate assurance of future performance and assume the Agreement.

The Agreement unambiguously gives control over the timing and method of liquidation to Metavante, the non-defaulting party. The plain language of the Agreement provides that the bankruptcy filing and continuing insolvency of LBSF or LBHI, the credit support provider, are ongoing, independent events of default that render LBSF unable to meet a condition precedent and suspend Metavante's obligation to make payments.

The Bankruptcy Code compels this result. The plain language of the safe harbor for swaps favors Metavante. The express language of § 560 protects without any limitation Metavante's right to liquidate and offset its swap position. But even if the Court were to find the statute ambiguous and look to its legislative history, it is clear that Congress recognized that the safe harbor provisions do not mandate immediate post-bankruptcy termination of swaps and that

502694461.8

its purpose was to prohibit debtors like LBSF from playing the market. Simply put, Congress did not legislate to allow debtors to play the market while non-defaulting parties must immediately use or lose their contractual and statutory rights.

Congress reasonably and intentionally conferred on non-defaulting parties the right contained in swap agreements globally to control the timing of swap liquidations. Under U.S. bankruptcy law that right is counterbalanced by the debtor's right to reject. The interpretation for which LBSF and the Creditors' Committee contend here is unfounded and unfair and allows the party whose bankruptcy caused the problem in the first place to have complete control over the timing of the termination of the swap. That makes no sense. It is inequitable. It is not what Congress intended. It is not what the statutes provide. It injects uncertainty and confusion in swap transactions around the world. And, thus, the decision below must be reversed.

## ARGUMENT

> "As a result of the safe harbor provisions of the bankruptcy code, non-debtor counterparties . . . are permitted to exercise certain contractual rights triggered by a debtor's chapter 11 case or financial condition, including the right to leave in place contracts in which they owe money to the debtor. The debtor . . . remains exposed [to] such contracts."
>
> -- Harvey R. Miller, Esq., Weil, Gotshal & Manges LLP, Counsel to Lehman Brothers[1]

## POINT I

### APPELLEES CITE NO CONTROLLING AUTHORITY TO SUPPORT THEIR CONTENTION THAT METAVANTE HAD TO ACT IMMEDIATELY

**A.   The Debtor's Economic Assumptions Are Incorrect And Beyond The Record**

Without any basis in the record or in fact, LBSF erroneously argues (at 2) that Metavante could have terminated the swap Agreement and entered into replacement swaps "*without*

---

[1] *Too Big to Fail: The Role for Bankruptcy and Antitrust Law in Financial Regulation Reform: Hearing* Before *the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 111th Cong. 8-9 (October 22, 2009) (statement of Harvey R. Miller, Partner, Weil, Gotshal & Manges LLP).

*financial repercussions"* (emphasis added). Metavante made inquiries to locate a swap dealer to pay Metavante to step into LBSF's shoes as an off-market buyer for this swap as LBSF suggests (at 6), but found none. If Metavante had terminated the Agreement shortly after LBSF filed bankruptcy, Metavante knew that LBSF would demand immediate payment in an amount between $11 million and $20 million (the October and November 2008 mark-to-market amounts, respectively) and that there was no off-market buyer for the Agreement. Metavante was certain that if it asserted setoff rights and withheld this payment, it would be exposed to protracted and expensive litigation and litigation risk. Early termination would lock Metavante into a loss of up to $20 million, with uncertainty as to its setoff or other rights under the Agreement.[2]

    Given these circumstances and to avoid substantial financial repercussions, Metavante chose to take control of its offset, liquidation, termination and acceleration rights under the Agreement. That is why Metavante exercised its right under the Agreement to suspend performance due to its counterparty's bankruptcy default and reserved its right under the safe harbor provision to later liquidate, terminate or accelerate its swap positions and settle-up with LBSF by netting or offsetting amounts owed to each other under the Agreement. When that occurs, Metavante may owe LBSF or LBSF may owe Metavante. Regardless of how it comes out, Metavante, as the non-defaulting counterparty under the Agreement and the safe harbor provisions, has certain control over the timing risk. LBSF retains the counterbalancing right to reject the Agreement. The market ultimately will determine the parties' choices and the financial outcome. Congress struck this sensible statutory and policy balance to allow non-defaulting swap participants to try to mitigate the impact of counterparty bankruptcy default, within the

---

[2] The actual cost of Metavante's immediate replacement hedge approximates $10.4 million.

debtor's right to affirm or reject the contract.  In this way, Congress sought to limit the cascading economic trauma that defaults can cause.

There is no contractual, statutory, policy or equitable rationale for the result LBSF seeks where Metavante would have had the immediate choice of locking in a $20 million loss or being at the complete mercy of LBSF's continuing demand for quarterly post-petition payments until the Agreement expires or LBSF decides to reject it.  And LBSF's claim that Metavante could have terminated without financial repercussions has no basis in the record or in economic reality.

**B.      The Opposition Is Built Around Legal Assertions That Lack Any Support**

Appellees' advocacy turns on bold, declaratory statements that, upon examination, lack support in the record, the statutes, the legislative history, or the case law.

LBSF overstates its case (at 2 and 7) by contending that the Supreme Court has somehow resolved the issue of whether Metavante must continue to make quarterly payments even though LBHI and LBSF are bankrupt and unable to perform under the swap Agreement.  The only Supreme Court case cited does *not* stand for the unqualified proposition that a debtor may enforce an executory contract without protecting the non-defaulting party's interests or compensating the non-defaulting party for its performance.  In *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984), the Supreme Court held that continuing performance under an executory collective bargaining agreement must be bilateral.  The Court required that:

> If the debtor-in-possession elects to continue to receive the benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, . . . which, depending on the circumstances of a particular contract, may be what is specified in the contract.

*Id.* (citations omitted).  Thus, LBSF is not entitled to compel Metavante to make quarterly payments without providing to Metavante a counterparty ready, willing, and able to provide the credit support necessary to effectuate the interest-rate swap protection for which Metavante is

paying. This LBSF cannot do. The consideration for which Metavante bargained is an effective counterparty so that Metavante could report the Agreement as a hedge against interest rate fluctuation. In contravention of the case law, the Bankruptcy Court improperly compelled Metavante to perform under the Agreement and refused to require LBSF to provide Metavante with the bargained for consideration or some other adequate protection.[3]

Appellees similarly strike out in their efforts to find in case law a non-existent implied time restriction on Metavante's netting and liquidation rights. LBSF overreaches in its contention (at 13) that *In re Mirant Corp.*, 314 B.R. 347 (Bankr. N.D. Tex. 2004), favors Appellees' position, for it does no such thing. The bankruptcy court in *Mirant* never imposed any sort of time limit by which counterparties have to exercise their rights under § 560. It simply held that the counterparty was well within its rights under § 560 to terminate the swap agreement seven weeks after the filing date. The *Mirant* court properly construed the statute and interpreted Congressional intent as prohibiting any interference with the application of the § 560 safe harbor, as this Court should here.[4]

Likewise, LBSF's reliance (at 13) on *In re Amcor Funding Corp.*, 117 B.R. 549, 551-53 (D. Ariz. 1990), to support its safe harbor waiver argument, is misplaced. The *Amcor* decision merely stands for the proposition that a broker cannot invoke its own or its parent's financial

---

[3] In all of the other executory contract cases that LBSF cites (at 7), as in *Bildisco*, but unlike the decision below, the non-defaulting party was not compelled to perform unless and until the defaulting party provided adequate assurance of its ability to provide the consideration for which the non-defaulting party entered into the contract.

[4] Appellees fail to rebut that the Agreement also falls in the broader safe harbor of § 365(e)(2)(B) because it is a financial accommodation. LBSF (at 25) cites *Citizens and S. Nat'l Bank v. Thomas B. Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.)*, 969 F.2d 1013 (11th Cir. 1992), for the definition of a "financial accommodation" but the cited definition applies to the Agreement because it is a bilateral extension of credit which was specifically entered into so as to hedge Metavante's interest exposure under other loans. The primary and sole purpose of the Agreement is to serve as a financial accommodation.

condition as the basis for triggering and exercising certain safe harbor provisions (under § 555) to immediately sell securities in the debtor-customer's margin account. The *Amcor* court merely found that because the trigger was unrelated to the debtor's financial condition, the relevant safe harbor was inapplicable. *Id.* at 551.

*Calpine Energy Services, L.P. v. Reliant Energy Electric Solutions, L.L.C. (In re Calpine Corp.)*, Case. No. 05-60200 (BRL), 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) (cited at 2 and 9), is also inapposite to the applicability of the safe harbor provisions here as it was decided on its distinct facts. In *Calpine*, summary judgment was denied due to material fact issues as to implied waiver and the "doctrine of prevention." *Id.* at *4-*5. The court noted that a particular contractual provision did not constitute a contractual right to cause liquidation, termination, or acceleration that is enforceable under § 556 (which differs subtly from § 560), because the procedural two-day provision became operative *after* termination was caused. *Id.* at *6-*7.

For these reasons, the Court has not been presented with any precedential authority supporting Appellees' position that the safe harbor rights are time limited.

**C.    Congress Did Not Intend To Permit Bankrupt Swap Participants To Control The Liquidation Of Arrangements Caused By Their Own Defaults**

**1.    Congress Chose Not To Mandate Automatic Termination Or Time Restrictions On Swap Agreements In The Event Of A Bankruptcy Default**

Appellees weave together string cites and truncated parenthetical quotations to try to create the illusion that Congress intended to mandate the immediate or prompt termination of swap agreements at the commencement of a bankruptcy case. But the legislative history shows that Congress did no such thing. Witnesses at the 1990 House hearings on the safe harbor provision bluntly told the Judiciary Subcommittee that the legislation could have included but did not include automatic termination language in § 560. Instead, the witnesses made clear and

Congress plainly understood that it enacted a statute containing no timing mandate. Congress chose instead to empower the non-debtor, non-defaulting counterparty with control of the timing and the market risk of settling-up a swap agreement with a debtor. The testimony on this point could not be any more clear:

> It would be possible for Congress to mandate that all agreements terminate.… If you amend 560 to say you must terminate, all agreements must terminate upon bankruptcy. . . . [I]f Congress wants to do that . . . you do have to realize that means somebody could not deal with a financially troubled company, be willing to give them a swap, get adequate collateral and not have it terminate upon the bankruptcy.[5]

Congress also understood that the language of § 560 would not require a non-debtor counterparty to close out all swap agreements with a debtor simultaneously:

> [Section 560] allows the non-defaulting party to the swap agreement to "cherry pick" those contracts which will be terminated. It does not require that all swap positions, both favorable and unfavorable to the non-bankrupt party, be closed out simultaneously.[6]

Clearly, Congress understood that contracts unfavorable to the non-debtor may not be terminated at the inception of the bankruptcy case. Despite Appellees' references to "prompt" and "immediate" termination in the Congressional record, reflecting what Congress expected "prudent" swap *issuers* to do in the normal course when confronted with *customer* bankruptcies, Congress did not impose any time restrictions on non-defaulting parties seeking to net out their swap positions. The Bankruptcy Court erred by legislating a time limitation that Congress

---

[5] *Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing on H.R. 2057 and H.R. 1754 Before the Subcomm. on Economic and Commercial Law of the H. Comm. on the Judiciary,* 101st Cong. (1990) ("House 1990 Hearing") at 64-65 (statement of William J. Perlstein, Partner, Wilmer, Cutler & Pickering).

[6] House 1990 Hearing at 61-62 (statement of Richard L. Eping, Partner, Sidley & Austin).

knowingly omitted.[7]

### 2. LBHI's Bankruptcy Filing Did Not Trigger Section 365(e)(1)(B) In LBSF's Bankruptcy Case

We have been unable to find case law or legislative history for Appellees' hyper-linguistic claim that the *ipso facto* provision of § 365(e)(1)(B) applies upon the filing of *any* bankruptcy case.

No case in 30 years of jurisprudence interprets any *ipso facto* provision (whether under sections 365(e)(1)(B), 365(b)(2)(B) or 541(c)(1)(B)) to apply upon the bankruptcy filing of a non-substantively consolidated third party. The single case cited by the Committee, *J.P. Morgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re Charter Communications)*, 419 B.R. 221 (Bankr. S.D.N.Y. 2009), is inapposite as it involved an integrated enterprise in which the financial condition of an affiliate affected the debtor. Here, an *ipso facto* event is the bankruptcy filing of LBHI, not the financial condition of LBSF. The Bankruptcy Court made no factual findings of integration as in *Charter Communications*. Nor could there be, due to the oft-expressed position by each of LBSF and LBHI that they are distinct legal entities.[8] By refusing to recognize the bankruptcy filings of LBHI and LBSF as distinct events, the Bankruptcy Court

---

[7] Congress also enacted § 560 to bring U.S. law in line with the global swap marketplace:

> [T]his piece of legislation . . . make[s] it clear that those who write swap contracts in this country do so with a legal framework and a legal foundation like that in other nations. It is very important for the competitiveness of American financial institutions and also to the access that end-users have to this product . . . .

House Swap Hearing at 63 (statement of Mark C. Brickell, Chairman, International Swap Dealers Ass'n.). The Bankruptcy Court undermined this Congressional purpose when it ruled contrary to the global norm. *See Enron Australia v. TXU Electricity* (2003) 180 F.L.R. 376; *cf. Establishing resolution arrangements for investment banks,* HM Treasury, December 2009 at 118-120.

[8] *See* Debtors' Objection To The Motion Of The California Public Employees' Retirement System For An Order Pursuant To 11 U.S.C. §§ 362 And 553 For Relief From The Automatic Stay To Effect A Non-Mutual Setoff at 2, *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP) (Bankr. S.D.N.Y. Nov. 24, 2009).

502694461.8                                         8

in effect cause a substantive consolidation of the two entities despite a record directly to the contrary.

The legislative history provides no support for Appellees' position either. The 1978 debates in the House and Senate contain no discussion of any intent to broaden the *ipso facto* provisions to include the filing of *any* case. The only reference in either debate to § 365(e) is from Sen. Deconcini who stated that, "Section 365(e) is a refinement of comparable provisions contained in the House bill and Senate amendment.…"[9] Prior to this refinement, the House bill and Senate amendment versions cross-referenced § 362(b)(2), which provided "the commencement of the case under this title." In the Bankruptcy Code as finally enacted by Congress, the cross-reference to § 365(b)(2) in § 365(e)(1) is replaced with text that is parallel in both subsections and § 541(c)(2) is revised to have the same language. LBSF and the Committee purport that this extreme expansion of the *ipso facto* provisions, to include *any* case, was intentional; however, the silence in the legislative history on this point is deafening.

\*    \*    \*

For all of these reasons, Appellees' position lacks legal support and Metavante respectfully requests that the decision below be reversed.

## POINT II

### METAVANTE ACTED WITHIN ITS STATUTORY RIGHTS TO LIQUIDATE, OFFSET, AND NET OUT ITS POSITIONS UNDER THE SWAP AGREEMENT

Appellees engage in a selective reading of § 560 in their effort to impose a time constraint on Metavante's exercise of its rights of "liquidation, termination . . . or to offset or net out" its positions under the swap Agreement. This broad safe harbor is expressly unlimited: the protected rights "shall not be stayed, avoided, or otherwise limited." By contrast, here,

---

[9] A&P Cong. Rec. S17403, 21 (1978) (statement of Sen. Deconcini).

Appellees focus only on "termination" and "the commencement of a case under this title" at the exclusion of all of the other statutory terms.[10]

In addition to termination, § 560 also protects the non-debtor's rights to liquidation and acceleration of a swap agreement, as well as to net and offset under the swap agreement. By reason of the cross-reference within § 560, the safe harbor provisions are immune from the *ipso facto* protections under § 365(e)(1) provided to a debtor. The safe harbor provisions are not limited just to the "commencement of a case under this title," they also apply to a breach arising from "the insolvency or financial condition of the debtor at any time before the closing of the case." 11 U.S.C. § 365(e)(1)(B), (A). Contrary to the Appellees' arguments, the safe harbor protections explicitly apply to breaches based upon a debtor's insolvency and financial condition *throughout the entire bankruptcy case*. Given this plain language statutory scope, it would make no sense for the safe harbor to be limited by an implied time limit at the outset of a case, for then § 365(e)(1)(A) as a trigger for the § 560 safe harbor protections would be rendered completely superfluous.

For these reasons, Appellees' effort to limit the scope and timing of Metavante's rights to settle-up the swap should be rejected and the decision below should be reversed.

## CONCLUSION

For the foregoing reasons and those set forth in Metavante's original Brief On Appeal, the Decision Below should be reversed or, in the alternative, the proceeding should be remanded for fact-finding.

---

[10] The Debtor's contention that this issue is not preserved for appeal is misplaced. This Court has "considerable discretion to review purely legal questions. . .." *Ford v. Bernard Fineson Dev. Ctr.*, 81 F.3d 304, 307 (2d Cir.1996) (internal citations omitted). *See also In re McLean Indus., Inc.*, 30 F.3d 385, 387 (2d Cir. 1994) (internal citations omitted).

Dated: January 28, 2010                          Respectfully submitted,

                                                              BAKER & HOSTETLER, LLP

By: /s/  *John Siegal*
      John Siegal (JS 1036)
      Richard J. Bernard (RB 6371)
      45 Rockefeller Plaza
      New York, NY 10111
      Telephone: (212) 589-4200
      Facsimile: (212) 589-4201
          - and -
      Donald A. Workman
      Washington Square, Suite 1100
      1050 Connecticut Avenue, N.W.
      Washington, D.C. 20036-5304
      Telephone: (202) 861-1500
      Facsimile: (202) 861-1783
          - and -
      Joseph F. Hutchinson, Jr.
      3200 National City Center
      1900 East 9th Street
      Cleveland, OH 44114-3485
      Telephone: (216) 621-0200

      and

      Bruce G. Arnold
      Daryl L. Diesing
      Patrick M. Harvey
      WHYTE HIRSCHBOECK DUDEK S.C.
      555 East Wells Street, Suite 1900
      Milwaukee, WI 53202
      Telephone: (414) 273-2100
      Facsimile: (414) 223-5000

      *Attorneys For Metavante Corporation*

502694461.8